# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Adventist Health System Sunbelt Healthcare Corporation, | Case No. 1:23-cv-07031 |
| Plaintiff, | **<u>Complaint</u>** |
| v. | **<u>Demand for Jury Trial</u>** |
| MultiPlan, Inc., | |
| Defendant. | |

# Table of Contents

Page

I.   Introduction and Nature of the Action ..........................................................................1

II.  The Parties .....................................................................................................................7

III. Co-Conspirators .............................................................................................................9

IV.  Jurisdiction and Venue.................................................................................................12

V.   Interstate Commerce ....................................................................................................13

VI.  Factual Allegations ......................................................................................................13

    A.   The MultiPlan Cartel is a Horizontal Price-Fixing Conspiracy............................13

        i.    MultiPlan Is a Health Insurance Company That Directly Competes
            With the Other Members of the MultiPlan Cartel .....................................13

        ii.   "MultiPlan 2.0":  MultiPlan Acquires Claims Repricing Tools To
            Suppress Out-Of-Network Reimbursements .............................................18

        iii.  There is Direct Evidence of the MultiPlan Cartel.....................................24

        iv.   MultiPlan's Cartel Agreements Cause Substantial and Direct Harm
            to Healthcare Providers..............................................................................33

        v.    There is Substantial Circumstantial Evidence of the MultiPlan
            Cartel..........................................................................................................34

        vi.   Numerous "Plus Factors" Reinforce the Existence of Agreements
            to Suppress Out-Of-Network Reimbursements .........................................39

    B.   Alternatively, the MultiPlan Cartel is a "Hub-and-Spoke" Cartel
        Agreement.............................................................................................................56

    C.   The MultiPlan Cartel Harms Competition Throughout the Relevant
        Market and Has No Procompetitive Effects .........................................................59

    D.   The MultiPlan Cartel Is Expanding to Suppress In-Network
        Reimbursement Under Its "MultiPlan 3.0" Scheme ............................................68

    E.   AHS Has Suffered Antitrust Injury and Has Antitrust Standing ..........................71

    F.   Fraudulent Concealment ......................................................................................75

    G.   Continuing Violation ...........................................................................................78

VII. Causes of Action ..........................................................................................................79

VIII. Prayer for Relief...........................................................................................................87

## I.  Introduction and Nature of the Action

1.  This case seeks to redress Plaintiff Adventist Health System Sunbelt Healthcare Corporation's ("AHS") injuries caused by a multi-year, ongoing conspiracy among competing commercial health insurance payors to reduce the reimbursements they pay to healthcare providers for out-of-network healthcare services.  This conspiracy was organized and orchestrated by Defendant MultiPlan, Inc. ("MultiPlan") and embodied in a series of written agreements between MultiPlan and virtually every other significant health insurance payor in the United States. MultiPlan has admitted (a) that these agreements exist and (b) that it competes against the other health insurance payors with whom it has entered into these agreements.  Therefore, MultiPlan is jointly and severally liable *per se* for all of the damages caused by those agreements.

2.  AHS is one of the largest non-profit hospital systems in the country, operating 50 hospitals in nine states and treating over 5.7 million patients every year.  Some of AHS's patients are entirely "in-network," meaning that all medical services they receive are covered, less a co-payment or co-insurance obligation, by a commercial healthcare payor.[1]  A substantial portion of AHS's patients, however, are "out-of-network" for at least some of the services they receive from AHS.

3.  Emergency care is a common example of these out-of-network services.  Every day, patients arrive at the emergency rooms of AHS's hospitals with serious and often life-threatening conditions.  Many of these patients will arrive at an AHS hospital because, due to location, expertise, or other factors, AHS is best-positioned to provide urgent and high-quality care, even though AHS is outside the patient's health insurance network.  In such situations, AHS's

---

[1] As used in this Complaint, unless otherwise specified, a health insurance "payor," "plan" or "network" refers to any payor of commercial health insurance claims, including HMOs, PPOs, TPAs, leased networks, and "narrow" networks.

doctors, nurses, and specialists provide the life-sustaining and life-saving medical care the patient requires, regardless of the patient's insurance coverage. This care runs the gamut, from setting a broken bone, to performing emergency surgery on a gunshot victim, to resuscitating and stabilizing a patient in cardiac arrest. After it has provided that care, AHS submits a claim to the patient's health insurance company seeking reimbursement for the out-of-network services provided to the patient.

4.     MultiPlan is one such health insurance payor. MultiPlan operates multiple nationwide networks of "preferred" healthcare providers, known as Preferred Provider Organization ("PPO") networks. It recruits healthcare providers, negotiates reimbursement rates with them, and sets certain quality and credentialing expectations for the healthcare providers in its network. Then, MultiPlan sells access to its PPO networks as part of a healthcare insurance plan.

5.     Prior to the conspiracy at issue in this case, MultiPlan and competing healthcare insurance payors made independent decisions about how much they would pay for out-of-network medical services. Each insurance company had a competitive incentive to pay reasonable reimbursement amounts to ensure healthcare providers would continue to provide out-of-network services to their insureds. Increasingly, however, these insurance companies began viewing their obligation to pay for the out-of-network healthcare services provided to their subscribers as a "pain point" and "major area of concern" that cut into their still-exorbitant profits.

6.     Around 2006, MultiPlan began devising a scheme to address this "concern," which resulted in what it refers to as "MultiPlan 2.0." Over the ensuing years, MultiPlan acquired a series of companies that had developed "analytic" tools designed to "reprice" out-of-network claims submitted by healthcare providers. "Reprice" is a euphemism. What these products really do—

and what they are designed to do—is calculate a reimbursement amount for out-of-network healthcare services that is far less than the insurance company would otherwise pay, and far less than the healthcare provider's claim for reimbursement.

7.     MultiPlan was not content to only use these repricing tools to underpay out-of-network claims submitted to its own PPO networks.[2]  It knew that if it was the only insurance company engaging in aggressively low "repricing," many out-of-network healthcare providers would stop treating patients covered by MultiPlan's PPO, forcing MultiPlan to abandon its repricing scheme.  MultiPlan thus set out to convince the rest of the healthcare insurance industry to agree to use its repricing methodology to suppress payments from commercial insurers to healthcare providers for out-of-network medical services.

8.     MultiPlan began marketing its suite of repricing tools to its competitors as an "out-of-network cost containment" solution.  It held, and continues to hold, marketing events designed to facilitate industry-wide agreement to use MultiPlan's repricing methodology, including "advisory board" meetings at luxury resorts and "road shows" where MultiPlan executives meet with the executives of competing healthcare networks to discuss how well MultiPlan's methodology is suppressing out-of-network reimbursement payments and brainstorm ways to make the scheme even more effective.  MultiPlan also issued secret "white papers" to its competitors explaining how MultiPlan's methodology suppresses claim reimbursement.  And MultiPlan directly communicated with competing commercial health insurance payors to solicit those payors to join the conspiracy.

9.     MultiPlan's efforts to enlist its competitors in this scheme have been spectacularly successful.  By 2017, MultiPlan had reached agreements with nearly every other significant

---

[2] AHS is not seeking damages for claims that it submitted to MultiPlan's PPO networks that MultiPlan repriced as in-network claims.

healthcare insurance payor in the United States to use MultiPlan's repricing tools to collectively suppress out-of-network reimbursements paid to healthcare providers.

10. MultiPlan's scheme is straightforward. MultiPlan and competing payors agreed to share their confidential, highly detailed claims data with MultiPlan in real time. Further, MultiPlan's competitors agreed to the methodology by which MultiPlan would reprice their out-of-network claims. Pursuant to this agreement, when a payor receives a provider's claim for reimbursement of out-of-network services, it sends the claim to MultiPlan, and MultiPlan uses its repricing algorithm to generate a reimbursement amount that is far lower than the payor would otherwise pay on the claim. MultiPlan then imposes the new price on the healthcare provider, giving the provider only days to respond to the "repriced" claim. As a condition of accepting the repriced claim, MultiPlan forces the healthcare provider to forego seeking reimbursement from any other source—effectively locking in the harm caused by the collusive underpayment. MultiPlan then takes a cut of the money that the payor withholds from the healthcare provider.

11. MultiPlan knows it can get away with acting, in the words of an analyst, "like a mafia enforcer for insurers," because virtually every commercial healthcare payor has agreed to use its repricing methodology, leaving healthcare providers with no practical option but to accept the "repriced" reimbursement amount that MultiPlan imposes. Indeed, MultiPlan has estimated that healthcare providers accept the reimbursement amounts MultiPlan imposes for out-of-network inpatient services 99.4% of the time. Even in the cases where MultiPlan offers to "negotiate," that negotiation is one-sided. MultiPlan knows that by bombarding healthcare providers with a constant stream of "repriced" reimbursement demands, it is usually practically impossible for healthcare providers to meaningfully negotiate or pursue dispute resolution with respect to individual claims. Accordingly, any "negotiation" with MultiPlan starts from the position of

MultiPlan's collusive offer to radically underpay healthcare providers for their services, and invariably ends with MultiPlan forcing the healthcare provider to capitulate to an extreme underpayment.

12.     The effects of MultiPlan's horizontal repricing agreement with its competitors have been dramatic.  By 2020, MultiPlan was using its repricing tools to underpay 370,000 out-of-network claims *per day* for over 700 health insurance companies, resulting in a total underpayment of approximately $19 billion per year to healthcare providers.

13.     MultiPlan and its Co-Conspirators say the billions of dollars they are withholding from healthcare providers every year allow them to reduce patients' healthcare costs.  That is not true.  Since the outset of MultiPlan's conspiracy, Americans' health insurance costs have continued to rise dramatically.  The money that MultiPlan and competing payors withhold from healthcare providers does not go to patients; it goes to insurance companies, their investors, and their executives.

14.     Thus, MultiPlan has created, and continues to orchestrate, an ongoing cartel agreement with competing health insurance companies throughout the United States to bilk healthcare providers of billions of dollars per year (the "MultiPlan Cartel").  MultiPlan's conduct is blatantly illegal.  It is *per se* illegal for actual or potential competitors to fix the prices that they will pay for services by agreeing on the method for calculating the offered repayment.  AHS has suffered damages due to the MultiPlan Cartel in an amount totaling hundreds of millions of dollars.

15.     AHS has overwhelming direct evidence that MultiPlan has entered into these agreements with its competitors.  MultiPlan has admitted that it enters into repricing agreements with competing commercial insurance payors in its filings with the Securities and Exchange Commission ("SEC") and state insurance commissioners.  Other commercial payors have admitted

that they have entered into repricing agreements with MultiPlan in sworn testimony at trial and written communications with healthcare providers. While direct evidence of an agreement to restrain trade is extremely rare in antitrust cases even after extensive discovery, it is present here in spades.

16.     Below is a representative example of such direct evidence. In this notice, MultiPlan informed AHS that it had "contracted with" Cigna and that, as a result of that agreement, MultiPlan was only offering to pay $1,131.63 for a $15,041.36 claim for out-of-network medical services—a 92.5% underpayment. AHS has thousands of similar notices in which MultiPlan admits to "contracting with" competing healthcare payors.[3]



17.     As set forth below, AHS challenges the MultiPlan Cartel under three alternative theories of liability pursuant to Section 1 of the Sherman Act. *First*, because MultiPlan is a

---

[3] Pursuant to federal law, AHS has redacted personally identifying healthcare information from this example. AHS will provide an unredacted copy of this record to MultiPlan when an appropriate protective order is entered by the Court.

horizontal competitor with the other commercial health insurance payors participating in the MultiPlan Cartel, its agreements with other health insurance payors to suppress and "reprice" out-of-network reimbursements to healthcare providers are a horizontal restraint of trade and *per se* violation of Section 1 of the Sherman Act.

18.     *Second*, even if MultiPlan did not compete against the other health insurance payors participating in the MultiPlan Cartel (which MultiPlan has repeatedly admitted to doing), MultiPlan's agreements with health insurance payors would still be a *per se* violation of Section 1 of the Sherman Act because, in the alternative, MultiPlan serves as the hub of a "hub-and-spoke" conspiracy.  The "spokes" of that conspiracy are the hundreds of agreements that MultiPlan has entered into with health insurance networks to use MultiPlan's repricing methodology.  The "rim" of the conspiracy is an agreement between the health insurance payors to use MultiPlan's repricing methodology rather than compete against each other and make independent decisions regarding the reimbursement of out-of-network claims.

19.     *Third*, even if MultiPlan was not the hub of a hub-and-spoke conspiracy, its "repricing" agreements with other commercial health insurance companies would still be an unreasonable restraint of trade under Section 1 of the Sherman Act because those agreements have had, and continue to have, anticompetitive effects throughout the relevant market for reimbursements of out-of-network healthcare services—as well as each relevant submarket for reimbursements by a particular payor—with no redeeming procompetitive benefits.

## II.     The Parties

20.     Plaintiff AHS is a Florida non-profit corporation headquartered in Altamonte Springs, Florida.  Founded in 1973, AHS is the largest Protestant hospital system in the United States and one of the largest not-for-profit health systems in the nation.  AHS's 50 hospitals include

over 8,200 licensed hospital beds. AHS also has 1,200 outpatient settings. AHS provides medical care to patients in hospitals and clinics located in Florida, Georgia, Colorado, Illinois, Kansas, Kentucky, North Carolina, Texas, and Wisconsin.

21.     Defendant MultiPlan, Inc. is a New York corporation. Its principal place of business is located at 115 Fifth Avenue, 7th Floor, New York, NY 10003.

22.     MultiPlan, Inc. is wholly owned by MultiPlan Holding Corporation.

23.     The ultimate parent company of MultiPlan Holding Corporation is MultiPlan Corporation. MultiPlan Corporation is a publicly traded entity.

24.     In 2010, MultiPlan acquired Viant, Inc. ("Viant"), a healthcare cost management company incorporated in Delaware and headquartered in Illinois.

25.     In 2011, MultiPlan acquired National Care Network, LP and its affiliate National Care Network, LLC, both healthcare cost management companies incorporated in Delaware and headquartered in Texas.

26.     In October 2020, Churchill Capital Corp. III and its related entities acquired MultiPlan, Inc. and its related entities. Churchill Capital Corp. III is a special-purpose acquisition company created to raise funds to take a private company public. It is incorporated in Delaware and headquartered in New York. After completing the acquisition of MultiPlan, Inc. and its related companies, Churchill Capital Corp. III changed its name to MultiPlan Corporation.

27.     Unless otherwise specified, this Complaint refers to MultiPlan, Inc., MultiPlan Holding Corporation, MultiPlan Corporation, MultiPlan, Inc., Churchill Capital III, Viant, Inc., Viant Payment Systems, Inc., National Care Network, LP, and National Care Network, LLC collectively as "MultiPlan."

### III.    Co-Conspirators

28.     As set forth in this Complaint, the MultiPlan Cartel includes virtually all of the major healthcare insurance payors in the United States, including the entities specifically identified below.

29.     Aetna, Inc. ("Aetna") is a subsidiary of CVS Health Corporation. It is a Delaware corporation that is headquartered in Hartford, Connecticut.  Aetna is one of the largest commercial health insurance payors in the United States.  It has a commercial insurance network that pays in-network and out-of-network claims from healthcare providers in all 50 states and the District of Columbia. Aetna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

30.     Elevance Health, Inc. (formerly known as Anthem, Inc.) ("Elevance") is an Indiana corporation with a principal place of business in Indianapolis, Indiana.  Elevance is a member of the Blue Cross and Blue Shield Association, a joint venture of insurance companies that work together to offer their members access to a nationwide network of healthcare providers.  Elevance licenses certain trademarks and service marks from the Blue Cross and Blue Shield Association in 14 states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, most of Missouri, Nevada, New Hampshire, parts of New York, Ohio, Virginia (except the Washington, D.C. suburbs), and Wisconsin.  Elevance is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate

in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

31. Centene Corporation ("Centene") is a Delaware corporation with its principal place of business in St. Louis, Missouri. Centene is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

32. The Cigna Group ("Cigna") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Broomfield, Connecticut. Cigna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

33. Health Care Service Corporation ("HCSC") is organized as a mutual reserve company under the laws of the state of Illinois with a principal place of business in Chicago, Illinois. HCSC is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States, including in Illinois, Montana, New Mexico, Oklahoma, and Texas. Those plans issue insurance

or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

34.     UnitedHealth Group Inc. ("UnitedHealth") is a Delaware corporation with a principal place of business in Minnetonka, Minnesota.   UnitedHealth has two divisions: UnitedHealthcare, which provides health benefits plans, and Optum, which provides health services, including pharmacy benefit manager services. UnitedHealth is a vertically integrated healthcare enterprise with a portfolio of wholly owned subsidiaries comprising a massive healthcare ecosystem. These subsidiaries include the largest commercial health insurance company in the United States, UnitedHealthcare.   UnitedHealthcare has a commercial insurance network that pays in-network and out-of-network claims from healthcare providers in all 50 states and the District of Columbia.   UnitedHealth's insurance plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service-only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

35.     Humana Inc. ("Humana") is a Delaware corporation with its principal place of business in Louisville, Kentucky.   Humana is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States.   The plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service-only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

36.     Aetna, Elevance, Centene, Cigna, HCSC, UnitedHealth, Humana, and each healthcare insurance company that has executed an out-of-network repricing agreement with MultiPlan (the "Co-Conspirators") has participated in the MultiPlan Cartel and performed acts and made statements in furtherance of the conspiracy. MultiPlan is jointly and severally liable for all of the acts and omissions of its Co-Conspirators whether named or not in this complaint.

## IV.     Jurisdiction and Venue

37.     This Court has subject matter jurisdiction over the federal antitrust law causes of action pursuant to 28 U.S.C. §§ 1331 and 1337, as this action raises federal questions under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

38.     This court has personal jurisdiction over MultiPlan, whose principal place of business is in New York. MultiPlan (a) is a New York domestic business corporation; (b) transacts business throughout the United States, including in this District; (c) engages in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District. MultiPlan, directly through its divisions, subsidiaries, predecessors, agents, or affiliates, continues to transact business in New York, including the repricing, payment, and negotiation of out-of-network commercial health insurance claims and operating a nationwide PPO network.

39.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because MultiPlan has its principal place of business in New York, certain unlawful acts alleged in this action were performed in this District, and these unlawful acts caused harm to interstate commerce in this District.

## V.      Interstate Commerce

40.     MultiPlan's activities as set out in this Complaint have substantially affected and are within the flow of interstate commerce.  Healthcare providers that are reimbursed by MultiPlan and its Co-Conspirators, including AHS, provide services, goods, or facilities to persons who reside in other states.  In addition, MultiPlan operates a PPO throughout the United States.  The activities of MultiPlan, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## VI.     Factual Allegations

### A.      The MultiPlan Cartel is a Horizontal Price-Fixing Conspiracy

41.     The MultiPlan Cartel is a conspiracy between horizontal competitors to agree on a common methodology for suppressing payments of insurance claims for out-of-network healthcare services.

42.     MultiPlan has entered into written agreements with hundreds of its horizontal competitors—other commercial health insurance payors—to suppress and fix the reimbursement of out-of-network claims submitted by healthcare providers to members of the MultiPlan Cartel. Pursuant to these agreements, these horizontal competitors agree to share their confidential claims data with MultiPlan in order for MultiPlan to use an agreed-upon repricing methodology to suppress reimbursement payments.

### i.      MultiPlan Is a Health Insurance Company That Directly Competes With the Other Members of the MultiPlan Cartel

43.     MultiPlan owns and operates several PPO health insurance networks.

44. According to the Kaiser Family Foundation's 2022 survey of employers, PPOs are the most common type of employer-provided healthcare plan, covering almost half of all covered employees in the United States.

45. A PPO is a healthcare plan that contracts with medical providers to establish agreed-upon payment rates for the providers' services. Subscribers to PPO plans can access any healthcare provider in the PPO's network at a reduced rate, but typically pay a greater portion of a healthcare provider's fee if they choose an out-of-network healthcare provider.

46. According to MultiPlan, it operates "the oldest and largest independent Preferred Provider Organization (PPO) network" in the United States. Even as MultiPlan expanded its business from PPO networks into analytic "repricing" tools, as described below, it continued to operate its PPO networks. In 2022, it again claimed to operate "the largest primary PPO in the nation."

47. The reach of MultiPlan's PPO networks is enormous. MultiPlan estimates that its PPO networks have over 1.3 million healthcare providers under contract, encompassing approximately "920,000 practitioners, 4,800 acute care hospitals and 87,000 ancillary facilities."

48. MultiPlan's "primary" PPO networks are intended to serve as insurers' principal in-house network of healthcare providers. The PHCS Network is MultiPlan's flagship primary PPO network. MultiPlan touts this network as the country's "largest independent, nationwide primary preferred provider organization."

49. MultiPlan offers a number of other "primary" PPO networks to insurers with a regional focus. HealthEOS and HealthEOS Plus Networks are MultiPlan's primary regional PPO networks in Wisconsin, with some coverage in bordering Michigan, Minnesota and Illinois. Beech

Street Network is a regional PPO network serving Alaska, Nevada and Utah. AMN/HMN/RAN Networks are MultiPlan's regional commercial PPO networks in Arizona and Hawaii.

50.     A wide variety of entities subscribe to MultiPlan's "primary" PPO networks, including private and public-sector employers, insurance companies, tribal entities, and union benefit plans.

51.     MultiPlan also offers "complementary" PPO networks. These networks are marketed as additions to pre-existing commercial health insurance networks. Through these arrangements, MultiPlan provides competing insurance networks access to a "complementary" PPO network in exchange for a fee. This expands the number of healthcare providers who are effectively "in-network" for the insurance plans contracting with MultiPlan.

52.     MultiPlan's "complementary" PPO networks include MultiPlan Network, Beech Street Network, and IHP Network.

53.     MultiPlan makes money from each of these PPO networks by contracting with insurers and others to permit their plan beneficiaries to use the medical providers who are signed up with the networks.

54.     All of MultiPlan's PPO networks, regardless of their marketing, compete with other commercial health insurance payors to secure contracts with medical providers. Other payors, including members of the MultiPlan Cartel like Humana, UnitedHealth, HCSC, Cigna, Centene, Elevance, and Aetna, also operate their own PPO networks. For instance, Aetna offers Aetna Open Choice PPO plans, Elevance and other Blue Cross Blue Shield entities offer Blue Choice PPO plans, UnitedHealth offers UnitedHealthcare Options PPO plans. These PPO plans rely on PPO networks that directly compete with MultiPlan's PPO networks to obtain provider contracts.

55.     In its filings with the SEC, MultiPlan admits that its PPO networks compete against other commercial health insurance networks.  For example, in an Annual Report filed with the SEC on March 1, 2023, MultiPlan states: "We also compete with PPO networks owned by our large Payor customers[.]" MultiPlan's 2021 and 2022 Annual Reports contain similar admissions.

56.     In an August 2020 presentation, MultiPlan's then-Chief Revenue Officer Dale White explained that MultiPlan "compete[s] with regional PPOs . . . and network aggregators[.]"

57.     MultiPlan's payor competitors offer PPO networks that compete against MultiPlan's PPO networks on the basis of provider reimbursement and other factors. For example, Aetna, Elevance, Centene, Cigna, HCSC, UnitedHealth, Humana, Kaiser Permanente, Guidewell, Highmark, Molina, Blue Cross Blue Shield of Michigan, Blue Cross of North Carolina, Blue Cross and Blue Shield of Alabama, Blue Cross Blue Shield of Massachusetts, Independence Health Group, Bright Health, CareFirst, Blue Shield of California, Regence, and Horizon Blue Cross.

58.     MultiPlan operates its PPO network just as competing health insurance networks operate theirs.  It signs Participating Professional Group Agreements with physicians groups and Participating Facility Agreements with hospitals and surgical centers. It ensures that participating healthcare providers meet certain credentialing requirements, issues administrative handbooks to participating providers, audits the billing and medical records of participating providers, and conducts on-site reviews of participating providers' offices to ensure that they are complying with the terms of their agreements with MultiPlan.  It also enters into agreements with healthcare providers regarding the amount that the healthcare providers will be paid for providing services to patients in MultiPlan's network.

59.     MultiPlan holds licenses to operate its PPO network in various states.  For example, in New Jersey, MultiPlan and its subsidiaries, Private Healthcare Systems, Inc. and Beech Street

Corporation, are certified to operate as an Organized Delivery System ("ODS") (an ODS is a legal entity that includes PPOs). Likewise, South Dakota lists MultiPlan, Private Healthcare Systems, and Beech Street Corporation as managed care contractors. In Washington state, MultiPlan is registered as a Healthcare Benefit Plan Manager, which is an entity providing services or acting on behalf of a health carrier or employee benefits program.

60. MultiPlan also holds certifications and accreditations from healthcare insurance industry organizations. For instance, since August 2001, MultiPlan has held a certification for credentialing and recredentialing from the National Committee for Quality Assurance ("NCQA"), an industry association that provides independent health plan accreditations. Similarly, MultiPlan has received an accreditation for healthcare insurance network credentialing from the Utilization Review Accreditation Commission ("URAC"), an organization that credentials health plans, pharmacies, and provider organizations.

61. MultiPlan's executives have been forced to admit under oath that MultiPlan is a health insurance payor. As Marjorie G. Wilde, Senior Counsel for MultiPlan, explained in a declaration filed in *Jonathan Hott, M.D. v. MultiPlan, Inc.*, Case No. 1:21-cv-02421-LLS (S.D.N.Y. Aug. 15, 2022) (Dkt. 38-2):

> MultiPlan provides healthcare cost management services and operates a network-only preferred provider organization ("PPO") that does business nationwide by contracting, on the one hand, with healthcare providers, such as hospitals, physicians, physician groups and ancillary providers ("Network Agreements"). These contracted providers agree to give discount off of medical services rendered to the beneficiaries of clients of MultiPlan. . . . On the other hand, MultiPlan also contracts with its clients, which include health insurance carriers, health maintenance organizations, self-funded health plans, third party administrators, and other third-party payors that have members and beneficiaries who receive medical services from the provider network assembled by MultiPlan.

*Id.* ¶¶ 3–4.

62. Other health insurance companies recognize that MultiPlan is a competing network. During a trial, John Haben, the former Vice President of Networks at UnitedHealthcare, testified that "MultiPlan has the largest network in the country. . . . They have a broad network. Broader than United."

### ii. "MultiPlan 2.0": MultiPlan Acquires Claims Repricing Tools To Suppress Out-Of-Network Reimbursements

63. Starting in 2006, MultiPlan embarked on a strategy it has called "MultiPlan 2.0" by adding a new segment to its existing PPO networks, which it refers to as "analytics." MultiPlan describes its analytics-based services as "Data-driven, customized healthcare cost management solutions." As described further below, MultiPlan's analytic services offer insurance competitors an agreed-upon methodology to suppress payments to healthcare providers under the guise of a "fair" and "defensible" repricing scheme.

64. MultiPlan largely built its analytics business through acquisitions. In 2009, MultiPlan acquired Viant from Welsh, Carson, Anderson & Stowe. U.S. antitrust regulators expressed concerns regarding this acquisition. The U.S. Department of Justice opened a merger investigation and issued a "second request" for several categories of detailed information concerning the transaction.

65. In 2011, MultiPlan acquired National Care Network LLC ("NCN") for $50 million, effectively purchasing NCN's Data iSight repricing tool. According to MultiPlan's former CEO, Data iSight soon "became the foundation of [MultiPlan's] analytics business."

66. In 2014, MultiPlan acquired Medical Audit & Review Solutions ("MARS"), once again purchasing a repricing technology provider.

67.     Around June 2023, MultiPlan introduced a new "AI-enabled" out-of-network claim repricing methodology known as "Pro Pricer."  MultiPlan claims that this tool will reprice out-of-network claims for competing health insurance networks using over 40 years of pricing data.  However, the contractual basis for Pro Pricer remains the same—MultiPlan and its competitors agree on a methodology to suppress reimbursement payments to healthcare providers for out-of-network claims.

68.     MultiPlan uses analytic tools like Pro Pricer, Viant, MARS, and Data iSight to "reprice" out-of-network insurance claims.  MultiPlan has described itself as "the leader in out-of-network cost containment for our customers."

69.     In a simplified example of how MultiPlan's analytics tools work, an individual insured by one of MultiPlan's competitors receives emergency room services at an AHS hospital.  If AHS does not have a pre-existing contract governing the cost of these services with the insurer, that insurer is still required to pay for the services rendered to the insured individual.  So AHS treats the patient, then submits a claim to the insurer reflecting AHS's charges.  But, instead of paying AHS's claim, the insurer turns the claim over to MultiPlan.  MultiPlan then uses its analytic tools to "reprice" the claim pursuant to MultiPlan's agreement with the insurer.  MultiPlan then submits the repriced claim to AHS on a take-it-or-leave-it basis.  If AHS does not accept MultiPlan's "repriced" amount, the best it can hope to receive from negotiations with MultiPlan is still a substantial underpayment of its submitted claims.

70.     Outside the emergency room context, a similar dynamic is at play.  A patient who has a PPO insurance plan may prefer to be treated by an AHS physician, even though AHS is out-of-network under that patient's plan.  In a non-emergency room setting, AHS has no legal obligation to provide treatment to that patient.  Nevertheless, it may decide to provide treatment,

at least partly on the understanding that the patient has health insurance and that AHS stands to recoup some costs of treatment from the insurer on an out-of-network basis. AHS then provides the treatment and bills the insurance company. The insurance company then sends the claim to MultiPlan. MultiPlan reprices the claim using a formula agreed upon by the insurer. Finally, MultiPlan presents the repriced offer to AHS on behalf of the insurer for payment.



71.    MultiPlan makes money on its claims repricing services by charging its horizontal competitors a fee based on the difference between a healthcare provider's original claim and the amount the provider accepts following MultiPlan's repricing of the claim. This fee is usually equal to 5–7% of the "savings," but has been as high as 9.75%. As such, MultiPlan is incentivized to recommend the lowest reimbursement price possible, since it increases the fee MultiPlan charges to its competing insurance companies. In other words, the less money that is paid to healthcare providers, the more money MultiPlan makes.

72.    Commercial insurance payors admit that they have agreements with MultiPlan to reprice out-of-network claims. For example, UnitedHealthcare states that a healthcare provider may be offered "[a] rate recommended by Viant, an independent third-party vendor that collects and maintains a database of health insurance claims for facilities, then applies proprietary logic to

arrive at a recommended rate." Similarly, Blue Cross Blue Shield of Michigan has disclosed that MultiPlan is one of its "subcontractors," and describes MultiPlan's Data iSight service as "a pricing tool that . . . calculate[s] a 'fair' reimbursement."

73.     MultiPlan is not merely making recommendations on how competing payors should pay out-of-network claims. Because MultiPlan and its competitors have agreed on the repricing methodology that will be used, the repricing recommendations generated by MultiPlan's repricing tools are accepted by commercial health insurance payors and offered to healthcare providers without alteration. In many cases, the payor authorizes MultiPlan to make the repricing offer and negotiate the out-of-network claim on its behalf—completely abdicating all pricing authority to its competitor.

74.     MultiPlan's repricing tools are not merely the beginning of a negotiation. On its website, MultiPlan notes that Data iSight repricing is accepted 96% of the time by providers, and 93% of the time by facilities, "making it a defensible methodology for payors." A 2018 MultiPlan study cited even higher numbers: MultiPlan claimed 99.4% of all out-of-network claims for inpatient treatment that are repriced by Data iSight are accepted by healthcare providers. Those acceptance figures are similar for outpatient (98.7%) and professional (94.5%) care. Those high acceptance rates are not due to the validity of MultiPlan's repricing methodology, but rather are the result of the agreement between insurance competitors to fix prices, leaving healthcare providers no alternative but to accept the suppressed MultiPlan repricing offers. In the instances where MultiPlan offers to negotiate its repricing offers, those negotiations are one-sided. Because MultiPlan and its competing payors have agreed not to compete with one another, the only question in these negotiations is how much the healthcare provider will be harmed by the MultiPlan Cartel.

75. MultiPlan's analytics tools work by virtue of deep technological connections between MultiPlan and its competitors. Pursuant to their agreements with MultiPlan, competing insurance networks send their claims to MultiPlan via an electronic data interchange. These claims come to MultiPlan with detailed information such as the procedure code, dates of service, the billed amount, and an alphanumeric code indicating whether the claim is subject to an insurance network's previously disclosed reasonable and customary out-of-network rates.

76. Those claims are then loaded into MultiPlan's "Claims Savings Engine," known internally as FRED. Pursuant to the contracts between MultiPlan and its competitors, FRED routes the claim to one of several proprietary algorithms owned by MultiPlan, including Data iSight, Viant, Pro Pricer, and MARS. Those algorithms apply the pre-agreed claims suppression methodology to the claim to determine how little MultiPlan can offer a healthcare provider for the good or service in question and still have that offer accepted.

77. The exact nature of how MultiPlan's tools suppress reimbursement payments for out-of-network claims is non-public and proprietary. MultiPlan maintains internal white papers that describe in detail the relevant pricing processes that those tools use for out-of-network claims. However, a United States patent (U.S. Patent No. 8,103,522) filed by MultiPlan's subsidiary National Care Network, LLC, explains that when MultiPlan receives an out-of-network claim, it groups that claim into a refined diagnosis related group ("rDRG")—a standardized method of grouping insurance claims used by Medicare and some commercial health insurance networks that categorizes medical services on the basis of severity and complexity. Then, MultiPlan identifies all claims at similar hospitals for the same rDRG code. Next, MultiPlan attempts to estimate the hospital's cost of providing that rDRG-coded service based on that group of hospitals' cost report submissions to the U.S. Centers for Medicare and Medicaid and the wage index of the hospital

submitting the out-of-network claim. Next, MultiPlan calculates the markup and margin for each submitted rDRG-coded out-of-network claim using the following equation: ((Average Charge) - (Average Cost)/(Average Cost))*100.

78. MultiPlan's promotional materials refer to this as a "cost-up" methodology for claims repricing, since it involves calculating an estimate of the healthcare provider's costs for furnishing any billed-for service and building out a pricing offer from there. In other words, MultiPlan and its Co-Conspirators agree upon a fixed, across-the-board profit margin that the MultiPlan Cartel will allow healthcare providers to realize on their provision of out-of-network healthcare.

79. Once MultiPlan calculates the estimated margin and markup for a given out-of-network claim, it then applies a conversion factor based on the par median rates accepted by providers in the industry for comparable claims.

80. Once MultiPlan has calculated a reimbursement rate using the agreed-upon methodology, it presents the "repriced" claim to the healthcare provider through an electronic portal, fax, or letter. In these communications, MultiPlan typically notes that it is working with its own competitor to reprice the out-of-network claim. In the vast majority of cases, the offer is accepted despite being significantly below the usual and customary rate for the goods and services in question. When the healthcare provider accepts MultiPlan's offer, they are prohibited from balance billing for the remainder of their fees.

81. As explained above, MultiPlan's analytics products make money by taking a percentage, usually 5–7%, of the difference between the billed claim and the amount that the insurer actually pays for the care provided (known internally as the "PSAV"). According to a May

10, 2023 Quarterly Report that MultiPlan filed with the SEC, 90.9% of MultiPlan's revenues were generated through this PSAV model in the first three months of 2023.

82.     The MultiPlan Cartel has been tremendously successful, bilking healthcare providers out of billions of dollars even during a once-in-a-century pandemic.  Since acquiring Data iSight in 2011, MultiPlan's analytics business has grown considerably.  Revenues generated by Data iSight jumped from $25 million in 2011 to $323.7 million in 2019.  By 2020, analytics-based services such as Data iSight made up more than 59% of MultiPlan's annual revenues.  In 2021, MultiPlan's analytics-based services generated $709 million of its $1.1 billion in total revenues.  MultiPlan explained in 2023 that its analytics business typically earns profit margins "in the mid to high 60% range."

### iii.     There Is Direct Evidence of the MultiPlan Cartel

83.     There is direct and unambiguous evidence that the members of the MultiPlan Cartel have agreed to suppress out-of-network reimbursement payments.  This direct evidence includes (1) contracts between MultiPlan and competing commercial healthcare payors, (2) public statements and communications by MultiPlan and other members of the cartel admitting to the existence of these contracts, (3) internal communications between MultiPlan and other members of the cartel that have been revealed in other litigation, and (4) a U.S. patent that explicitly contemplates that MultiPlan and competing healthcare payors will agree upon a methodology or calculation for suppressing out-of-network reimbursements to healthcare providers.

*Contracts*

84.     MultiPlan has contracts with over 700 healthcare payors comprising nearly every healthcare payor in the United States.  Nearly all of those contracts include repricing services clauses in which MultiPlan and the healthcare payor agree to use one of MultiPlan's proprietary

repricing technologies to suppress payments on out-of-network healthcare claims and to split the revenue generated by this underpayment between MultiPlan and the healthcare payor. Despite MultiPlan's efforts to keep many of these agreements out of the public eye, many facts concerning those agreements are publicly known.

85.     Some versions of MultiPlan's contracts with competing healthcare payors contain an exhibit entitled "Repricing Services" that allows the competing payor to route its out-of-network claims to MultiPlan for repricing via a direct electronic data interchange or a web-based interface. The contract also specifies the repricing method that would be used. Thus, MultiPlan and its competitors have entered into agreements which explicitly discussed the methodology they would use to suppress payments for out-of-network services to healthcare providers.

86.     The existence of several of MultiPlan's contracts to suppress out-of-network claims reimbursements only became public when they were recently filed with the Washington State Insurance Commissioner.

87.     In 2014, Cigna and MultiPlan entered into a Master Services Agreement, which has been amended several times to include statements of work and addendums. While the full documents are not presently publicly available, the Washington State Insurance Commissioner indicates that the agreements include clauses covering "repricing for services and procedures"—i.e., MultiPlan's out-of-network claims suppression technology. Information about these agreements was not made public until it was filed with the Washington State Insurance Commissioner on June 17, 2022.

88.     On May 1, 2015, Aetna and MultiPlan entered into a Network Rental Agreement. That agreement contains an amendment that requires Aetna to use Data iSight. Although this

contract was entered into in 2015, it was not made public until it was filed with the Washington State Insurance Commissioner on December 22, 2021.

89. In 2018, Kaiser Foundation Health Plan of the Northwest and MultiPlan entered into a Medical Reimbursement Analysis Services agreement that contained provisions addressing the repricing of out-of-network medical services. Although this contract was entered into in 2018, information about the agreement was not made public until it was filed with the Washington State Insurance Commissioner on January 20, 2022.

90. Similarly, Asuris Northwest Health, Regence Blue Shield, Bridgespan Health Company, Regence Blue Cross Blue Shield of Oregon, and Regence Blue Cross Blue Shield of Idaho entered into agreements with MultiPlan that address the repricing of out-of-network medical services. Information about the agreements was not made public until it was filed with the Washington State Insurance Commissioner in 2022 and 2023.

91. MultiPlan has taken steps to keep its agreements with competing health insurance payors a secret. For example, MultiPlan has a Service Agreement with Allied National, Inc. ("Allied") under which Allied utilizes MultiPlan's repricing methodology. The Service Agreement between MultiPlan and Allied states that it is "Confidential Not For Distribution." The Service Agreement also contains a Confidentiality and Proprietary Rights provision, which defines "Confidential Information" to include information relating to MultiPlan's repricing services and methodologies. The Service Agreement prohibits Allied from using that Confidential Information for any reason other than using MultiPlan's repricing services. When Allied filed a third-party complaint in *Butler v. Unified Life Insurance Company, et al.*, Case No. CV 17-50-SPEW-TJC (D. Mont. Nov. 18, 2021) that contained three paragraphs that disclosed information regarding MultiPlan's repricing services, MultiPlan sued Allied for disclosing that information. Ultimately,

Allied removed its filing from the docket and redacted those paragraphs in its third-party complaint.

92. Upon information and belief, MultiPlan has entered into additional contracts with many competing commercial health insurance companies that require MultiPlan's competitors to use its out-of-network claims suppression technology.

### *Public Statements and Communications*

93. Members of the MultiPlan Cartel have admitted to the existence of their agreements to suppress out-of-network reimbursement claims in communications with healthcare providers and the public.

94. AHS routinely receives communications from MultiPlan in which MultiPlan concedes that it has "contracted with" various healthcare payors that compete against MultiPlan's PPO networks and that the result of MultiPlan's agreements with its competitors is that AHS will be radically underpaid for its healthcare services.

95. AHS is not alone. Jeffrey Farkas, MD, LLC submitted a claim for $332,300 to Great-West Healthcare d/b/a Cigna Corp for service performed on February 17, 2016. MultiPlan responded with a fax sent to Dr. Farkas's office on June 13, 2018. The fax revealed that "Great-West Healthcare, now part of CIGNA has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out-of-network for this claim. This agreement may expedite payment and decrease the Patient's responsibility." MultiPlan offered to pay Dr. Farkas only $12,407 for his services, a difference of $319,893 on a single out-of-network claim. MultiPlan went on to state, "By signing this agreement, Provider accepts this Proposed Amount and agrees to reduce the liability of the Patient and Payor. Provider agrees not to bill the Patient, or financially responsible party, for the difference between the Billed Charges and the Proposed

Amount." MultiPlan gave Dr. Farkas' office two days to decide whether to accept the take-it-or-leave-it offer.



Great-West Healthcare, now part of CIGNA has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out of network for this claim. This agreement may expedite payment and decrease the Patient's responsibility.

**Jeffrey Farkas MD LLC** agrees to accept the Proposed Amount listed below as payment-in-full (less any applicable deductible, co-insurance, or co-payment amounts in addition to non-covered items) for services rendered to this Patient on the following date(s):

| Date(s) of Service | Billed Charges | Proposed Amount |
|---|---|---|
| 02/17/2018 | $332,300.00 | $12,407.00 |

By signing this agreement, Provider accepts this Proposed Amount and agrees to reduce the liability of the Patient and Payor. Provider agrees not to bill the Patient, or financially responsible party, for the difference between the Billed Charges and the Proposed Amount. Provider retains the right to bill the Patient (or financially responsible party) for items not covered under the Patient's benefit plan and for any applicable deductibles, co-insurance, or co-payments. Provider shall not waive any such patient responsibility amounts due directly from the patient (or other financially responsible party).

96.    Similarly, in November 2021, another medical provider submitted $4,500 in charges incurred on November 13, 2021 to Anthem, Inc. MultiPlan responded with a letter stating: "Anthem, Inc. has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out-of-network for this claim." MultiPlan offered to pay only $673.65 on the $4,500 claim.

97.    Likewise, in 2021 a healthcare provider submitted a charge of $3,700 to UnitedHealthcare. Viant (a division of MultiPlan) responded by stating that it would only agree to accept an adjusted price of $323.58 "as payment in full." Viant then stated that if the healthcare provider accepted that adjusted price, it could not "balance bill patient or patient's family (except for deductible, coinsurance, and non-covered items, if applicable)."

98.     MultiPlan's public statements concede the existence of its agreements to suppress out-of-network reimbursements with its competitors.  On August 18, 2020, Mark Tabak, the CEO of MultiPlan at the time, described MultiPlan as "the leader in out-of-network cost containment." As Mr. Tabak explained to investors, MultiPlan has entered into "multi-year contracts with the leading payors," i.e., health insurance companies, to provide this service.  He stated that MultiPlan drives down out-of-network payments by "captur[ing] [out-of-network] claims" from competing health insurance networks that contract with MultiPlan for its claims repricing services.  MultiPlan then "direct[s]" those claims "to the proper solution set."  While these "solution set[s]" may vary in name, they all serve the same function: to set out-of-network reimbursement rates at agreed upon levels or by using an agreed upon methodology.

### *Communications with Cartel Members*

99.     MultiPlan's relationship with UnitedHealthcare shows how the price-fixing conspiracy unfolds in practice.  UnitedHealthcare is the single largest health insurance company in the United States.  As with many subscribers to MultiPlan's claims repricing services, UnitedHealthcare runs PPO networks that compete with MultiPlan's PPO networks.  Beginning

on July 1, 2017, UnitedHealthcare and MultiPlan entered into an explicit agreement to suppress out-of-network health insurance reimbursement prices.

100.    Initially, MultiPlan induced UnitedHealthcare to agree to cut out-of-network reimbursements by explaining that UnitedHealthcare's competitors had already entered into similar agreements with MultiPlan.  In 2016, MultiPlan's former Chief Revenue Officer, Dale White, wrote an email to UnitedHealthcare executives, explaining that 7 of UnitedHealthcare's top 10 competitors were using MultiPlan's repricing services.  Mr. White encouraged UnitedHealthcare to do the same, writing: "Implementing these initiatives will go a long way to bring UnitedHealth back into alignment with its primary competitor group [Blues, Cigna, Aetna] on managing out-of-network costs."

101.    One of the recipients of Mr. White's email, Rebecca Paradise, UnitedHealthcare's Vice President of Out-Of-Network Payment Strategy, explained that a key factor in UnitedHealthcare's decision to agree to use MultiPlan's out-of-network reimbursement suppression technology was that the technology "was widely used by our competitors."

102.    Scott Ziemer, Vice President of Customer Solutions – Network at UMR (a UnitedHealthcare subsidiary), testified under oath that MultiPlan recommended that UnitedHealthcare use a repricing formula that capped out-of-network payments at 350% of Medicare rates.

103.    Mr. White, MultiPlan's Chief Revenue Officer at the time, relayed to another UnitedHealthcare executive, John Haben, that by agreeing to use the 350% of Medicare rates formula in Data iSight, UnitedHealthcare would "be in line with another competitor" and "leading the pack along with another competitor."

104. Mr. Haben summarized MultiPlan's recommendation in a 2017 email and presentation he sent to senior management at UnitedHealthcare entitled "OCM [Outlier Cost Management]-MultiPlan Benchmark Pricing Overview." In the email, Mr. Haben wrote, "[t]oday, our major competitors have some sort of outlier cost management; they use Data iSight. United will be implementing July 1, 2017."

105. In the same email, Mr. Haben explained that the agreement between UnitedHealthcare and MultiPlan could "improve"—i.e., cut—UnitedHealthcare's out-of-network claim reimbursement payments "by $900 million" per year.

106. Mr. Haben later testified under oath that UnitedHealthcare initially agreed with MultiPlan to suppress out-of-network claims in a less aggressive manner that put UnitedHealthcare in the "middle of the pack of its peers."

107. Over time, UnitedHealthcare became more aggressive and agreed with MultiPlan to implement lower reimbursement formulas in Data iSight, consistent with others in the industry.

108. UnitedHealthcare wrote in a Customer Impact Advisory Brief that it was "utilizing Data iSight, owned by MultiPlan, to administer [an outlier cost management program]. 90 other payors nationwide use [Data iSight] in a similar manner."

109. UnitedHealthcare tracked the amount of money that it underpaid healthcare providers using "OCM," its internal term for claims that were routed to Data iSight. UnitedHealthcare employees prepared a table with a column entitled "No OCM," meaning the additional amount that UnitedHealthcare would have paid on out-of-network claims had UnitedHealthcare not agreed with MultiPlan to use MultiPlan's Data iSight product to suppress out-of-network reimbursement payments. That internal analysis shows that UnitedHealthcare's

agreement with MultiPlan resulted in UnitedHealthcare paying hundreds of millions of dollars less in out-of-network claims than it would have without its agreement with MultiPlan.

110.    MultiPlan has entered into similar agreements with each of the largest health insurance companies in the United States, that would otherwise be competing amongst themselves. In 2021, Sean Crandell, the Senior Vice President of Healthcare Economics at MultiPlan, testified under oath that "all of the top 10 insurers in the U.S." are MultiPlan customers.  As of June 2023, MultiPlan touts that "all of the top 15 insurers" in the country have agreed to use MultiPlan as their repricer for out-of-network claims.

111.    Each of those "top 15" insurers compete with MultiPlan's PPO networks to attract healthcare providers to become in-network and to induce healthcare providers to treat out-of-network patients through the payment of competitive reimbursement rates.

112.    MultiPlan also engages in "road shows" in which it travels to competing insurance companies and provides updates on the claims repricing methodologies adopted by MultiPlan's customers and their competitors.

113.    MultiPlan executives Dale White and Susan Mohler are involved in these "road show" presentations, wherein MultiPlan produces detailed descriptions of Data iSight's methodology, reviews the "savings" achieved for MultiPlan's customers, and recommends ways to further suppress out-of-network reimbursements.

114.    MultiPlan also prepares white papers for its claims repricing clients and Co-Conspirators which are essentially user's manuals instructing them on how to implement the scheme.  These white papers include references to the claims repricing methodologies adopted by horizontal competitors in the U.S. Commercial Reimbursement Market.

*MultiPlan's Patent*

115.    As noted above, MultiPlan has obtained a U.S. patent that describes its repricing methodology.  That patent explains that MultiPlan and competing health insurance networks are explicitly agreeing on the methodology that will be used to calculate and suppress out-of-network reimbursement payments.  Specifically, the patent explains that MultiPlan's customers (i.e., competing healthcare payors) agree with MultiPlan on the methodology or calculation that MultiPlan's repricing tool will use to suppress reimbursement payments to healthcare providers.

### iv.    MultiPlan's Cartel Agreements Cause Substantial and Direct Harm to Healthcare Providers

116.    MultiPlan has been similarly open about the effect its anticompetitive price-fixing has on providers.  In its investor presentations, MultiPlan openly touts the fact that it helps its competitors systematically underpay healthcare providers.  During a fall 2021 investor roadshow presentation, MultiPlan explained to investors that in an illustrative world "Without MultiPlan" a doctor could expect to make $800 on an out-of-network claim, but in an illustrative world with MultiPlan, a doctor would only make $600 on the same out-of-network claim—a 28.6% difference.

117.    In another presentation, MultiPlan claimed that its repricing tool was even more effective, writing that it provided insurers "savings of 61%–81% off billed charges."

118.    MultiPlan benefits from the MultiPlan Cartel in the same ways its horizontal competitors do.  By agreeing to suspend competition with respect to the reimbursement of out-of-network claims, MultiPlan is able to artificially underpay those claims, inflating the profits of its PPO insurance business.

### v.     There Is Substantial Circumstantial Evidence of the MultiPlan Cartel

119.    Because AHS has cited extensive direct evidence of the MultiPlan Cartel, no circumstantial evidence is needed to infer the existence of the cartel.  Nevertheless, reams of circumstantial evidence supports the existence of the cartel.

#### *Parallel Conduct*

120.    The members of the MultiPlan Cartel engaged in parallel conduct.  They suppressed the amount paid to healthcare providers for out-of-network claims and, in a continuous and parallel fashion, sent repricing notices and depressed payments to healthcare providers pursuant to the MultiPlan Cartel agreement.

121.    MultiPlan also facilitated a transition away from a marketplace in which commercial insurance networks competed with one another to offer out-of-network providers usual, customary, and reasonable ("UCR") reimbursement payments to a coordinated regime in which commercial health insurance networks cut reimbursement payments to healthcare providers and then split those "savings" with self-funded insurance plans.

122.    The insurance market is made up of two types of plans, risk-based (also called "fully insured") and administrative services only ("ASO") (also called "self-funded").  Under a risk-based model, the insurance company collects premiums and pays claims.  If the premiums exceed the claims, the insurance company profits, but if the claims exceed the premiums, the insurance company carries the risk of loss.  Under an ASO model, the employer carries the risk instead—the premiums are paid into the coffers of the employer and the employer is responsible for paying its employees' claims.  The employer pays the insurance company a fixed administrative services fee, per member, per month, (a "PMPM" fee) to administer the ASO plan. Under these ASO contracts, the employers take on the risk and associated insurance companies

enter into "shared savings agreements" that permit the insurance company to send out-of-network claims for ASO employers to MultiPlan for repricing. Large employers, which make up a substantial or even dominant portion of the market for commercial insurance, are almost all on ASO contracts.

123.    In order to profit from the out-of-network reimbursement suppression under the MultiPlan Cartel, the cartel members added new terms to their ASO contracts. In addition to the PMPM fees, those ASO contracts now require self-insured groups to pay a percentage (as high as 35%) on the difference between a billed out-of-network charge and the amount paid on that out-of-network claim, known as the "shared savings fee." Under the most egregious instances of claim reimbursement suppression, that shared savings fee could end up being even higher than the amount paid to the provider performing the services.

124.    For example, a notification concerning Nokia Corporation's ASO plan notes that Nokia participates in a "shared savings program" administered by UnitedHealthcare. That notice states: "UnitedHealthcare uses a service called Data iSight to review select out-of-network claims and recommend a reduced payment amount for out-of-network covered services."

125.    These shared savings agreements generate tremendous profits for insurance companies and self-funding employers at the expense of medical providers. UnitedHealthcare made approximately $1.3 billion from its shared savings agreements to suppress out-of-network claims in 2020. Moreover, in an internal presentation, UnitedHealthcare stated that it intended to cut its out-of-network reimbursements by $3 billion by 2023.

126.    Therefore, if a subscriber group self-finances its health insurance benefits and enters into an ASO agreement with a commercial health network, the subscriber group, health insurer, and MultiPlan enter into multiple explicit agreements to suppress out-of-network

reimbursement payments to healthcare providers and then split the ill-gotten profits from their conspiracy among MultiPlan, the insurance company, and the subscriber group.

127.    As a result of these agreements, UCR reimbursement, once the industry standard, has gone by the wayside.  As John Haben, the former Vice President of Networks at UnitedHealthcare, testified under oath, UnitedHealthcare, like the rest of the commercial insurance industry, moved from paying out-of-network claims at "reasonable and customary" rates, or rates determined by benchmarking databases, to using MultiPlan's out-of-network claim suppression tools.  One example of such a benchmarking database is FAIR Health, an independent database that houses aggregated information designed to provide a reasonable and consistent basis for setting reimbursement rates.  Pre-MultiPlan, FAIR Health was widely used throughout the industry in pricing out-of-network reimbursements.

128.    Mr. Haben testified that UnitedHealthcare did not want to continue using "reasonable and customary" reimbursement rates because those costs were "uncontrolled."  As a result, "reasonable and customary" reimbursements for out-of-network claims are a "legacy program" that UnitedHealthcare rarely, if ever, uses.

129.    Instead, UnitedHealthcare, like all of its competitors, has shifted to a "shared savings" model, where instead of paying the prevailing, "reasonable" rate for a service, they all use the same tools to reduce reimbursements.  And since they all have the same "shared savings" clauses in their ASO contracts, they all profit in the exact same way.

130.    This parallel shift to a new paradigm was orchestrated by MultiPlan, whose sales executives have repeatedly touted the ability of their repricing service to create "savings" by underpaying out-of-network claims.  For instance, in 2014 MultiPlan told competing insurance networks that inpatient and practitioner savings for its Data iSight product were between 55% and

65%. They told multiple competing networks about the "success" their competitors had experienced in implementing Data iSight and other MultiPlan claims repricing services—thereby encouraging those networks to join their competitors in implementing parallel conduct.

131. MultiPlan advertises to competing health insurance networks that Data iSight achieves "optimal reimbursement"—i.e., lower payments to healthcare—to providers when "compared to Usual and Customary and Medicare-Based pricing."

132. As a result of this coordination by MultiPlan, nearly all major insurance companies have implemented "shared savings" strategies, and nearly all major insurance companies use MultiPlan's tools to implement those services.

133. MultiPlan's repricing services also generate parallel repricing offers. According to a complaint filed against MultiPlan in *Emergency Group of Arizona Professional Corp., et al. v. United Healthcare, Inc., et al.*, Case No. CV2019-004510 (Sup. Ct. Ariz., Maricopa Cnty., June 10, 2019), MultiPlan's repricing services result in members of the MultiPlan Cartel offering parallel reimbursement amounts for out-of-network services regardless of the location where the service is offered. This makes no sense absent the existence of a conspiracy. Because the cost of care in Manhattan, New York, is higher than in Manhattan, Kansas, all legitimate methods of reimbursing out-of-network claims account for the geographic difference between where care is administered. For instance, charges that submitted for CPT code 99284 (emergency department visit for the evaluation and management of a patient) on different dates in early 2019 in different states resulted in MultiPlan presenting the same reimbursement price:

| Location | Date of Service | Billed Amount | CPT Code | Allowed Amount |
|---|---|---|---|---|
| Wyoming | 1/21/19 | $779 | 99284 | $413.39 |
| Arizona | 1/25/19 | $1,212 | 99284 | $413.39 |
| New Hampshire | 1/25/19 | $1,047 | 99284 | $413.39 |
| Oklahoma | 2/8/19 | $990 | 99284 | $413.39 |
| Kansas | 2/10/19 | $778 | 99284 | $413.39 |
| New Mexico | 2/10/19 | $895 | 99284 | $413.39 |
| California | 3/25/19 | $937 | 99284 | $413.39 |
| Pennsylvania | 5/20/19 | $1,094 | 99284 | $413.39 |

134.    In a competitive market, competing health insurance networks would not agree to use a common tool provided by the same company to suppress out-of-network claims.  Among other things, by paying reasonable out-of-network reimbursement rates, health insurance networks could be certain that their insureds would not be refused treatment in contexts where a healthcare provider had the ability to refuse treatment (i.e., outside of the emergency department).  Moreover, absent a conspiracy, health insurance networks would make independent decisions on how to reimburse out-of-network claims, with the freedom to consider the specific circumstances underlying each submitted claim, rather than automatically underpay claims through MultiPlan's across-the-board methodology.

135.    Even if competing health insurance networks' only natural incentive was to keep out-of-network claims effectively contained, they would not naturally agree to do so using the same tools from the same provider, which also happens to be a rival PPO network operator. Instead, these competitors should want to compete to find the optimal balance between keeping the costs of claims down while also minimizing the costs of claims disputes that arise when reimbursement offers are too low.

136.    But if the competing health insurance networks implement the exact same reimbursement suppression strategies, they can collectively maximize their profit while shielding

themselves from the costs of disputes. The only market players that lose are the providers who have no choice but to accept the suppressed reimbursement offers.

### vi. Numerous "Plus Factors" Reinforce the Existence of Agreements to Suppress Out-Of-Network Reimbursements

137.    Plus factors are categories of evidence that help courts and juries differentiate competition from collusion. Here, multiple "plus factors" support the existence of MultiPlan's collusive agreements to suppress out-of-network reimbursements, including (1) the high market concentration of the members of the MultiPlan Cartel, (2) high barriers to entry, (3) ample motive to participate in the MultiPlan Cartel, (4) a history of prior collusion, (5) numerous opportunities to collude, including those directly facilitated by MultiPlan, (6) actions against self-interest which only make sense as part of a common plan, (7) evidence of cartel enforcement mechanisms, (8) pervasive and systematic information exchange between the cartel members and MultiPlan, and (9) the existence of customary patterns and courses of dealing that can only be explained by the existence of a cartel agreement. These "plus factors" equally support the existence of agreements between MultiPlan under a horizontal price-fixing conspiracy, a "hub-and-spoke" conspiracy, and a vertical price-fixing conspiracy resulting in an unreasonable restraint of trade.

### a. High Collective Market Concentration

138.    The relevant service market for the purposes of AHS's claims is the market for reimbursements paid by commercial insurers to healthcare providers for out-of-network medical services (referred to throughout as the "Commercial Reimbursement Market"). Within the relevant market, there are submarkets for reimbursements paid by each specific commercial insurer (or other payor) for the out-of-network medical services provided to patients enrolled in that insurer's health insurance plan. In this market and its submarkets, healthcare providers like AHS

function as sellers of out-of-network medical services, while commercial insurers like MultiPlan and its Co-Conspirators function as buyers of those services.

139.    Healthcare providers have no reasonable substitutes for the reimbursements provided by commercial insurers for out-of-network medical services.  It is illegal under federal law and various state laws for healthcare providers to seek reimbursements from insureds (i.e., "balance billing") for most out-of-network claims.  Moreover, MultiPlan, which along with its Co-Conspirators collectively dominate the relevant market, forces healthcare providers to forego any reimbursement from insureds as a condition of receiving any compensation at all for out-of-network claims.

140.    While healthcare providers can receive reimbursement payments from governmental sources, such as Medicare, Medicaid, and Tricare, none of those sources of payment compete against commercial health insurance.  These forms of government-paid insurance address populations that are not typically served by commercial health insurance.  For example, Medicare and Medicaid have statutory age, income, or disability requirements.  Similarly, Tricare is available only to current and former members of the United States military.

141.    Commercial insurers want to maintain access to a broad range of out-of-network healthcare providers so they can market the reach of their insurance products.  As a result, commercial insurers compete with one another in the relevant market to reimburse out-of-network healthcare providers at reasonable rates so such providers will accept patients from their commercial health insurance network.

142.    Some commercial insurance networks, such as MultiPlan's PHCS Network, are marketed directly to employment groups, individuals, or other payors, while other commercial insurance networks, such as MultiPlan's "wrap" PPO network, are marketed to other commercial

insurers. In either case, the number and range of healthcare providers willing to accept patients on an out-of-network basis is a key selling point, and therefore the necessity of competition between commercial insurers to compensate healthcare providers for out-of-network services is unchanged.

143. The relevant geographic market for purposes of AHS's claims is the United States. Medical providers in the United States cannot practicably turn to payors in other countries, where private medical insurance is uncommon or non-existent and nearly all medical care is administered as a part of a comprehensive government program, for reimbursement of out-of-network medical services. The United States healthcare industry, including the market for reimbursement of out-of-network services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries, and is subject to a variety of unique federal and state laws and regulations that apply only in the United States. The relevant geographic market is not smaller than the United States because healthcare providers can practicably turn to commercial insurers located in other parts of the country for reimbursement of out-of-network services.

144. MultiPlan and its Co-Conspirators, through their conspiratorial agreements, collectively hold dominant power in the relevant market. Nearly every commercial insurer that participates in the relevant market has agreed with MultiPlan to suppress out-of-network reimbursement payments. As MultiPlan has repeatedly stated, each of the "top 15" health insurance companies and over 700 payors subscribe to its claims repricing service. The members of the MultiPlan Cartel, including MultiPlan, UnitedHealth, Cigna, Humana, Elevance, Aetna, Guidewell, and others, collectively control at least 90% of the relevant market.

145. MultiPlan stands nearly alone in the out-of-network claims repricing business. It faces only limited competition, most notably from a company called Zelis. MultiPlan claims that Data iSight differentiates itself through its patented repricing methodology and its large,

proprietary database of historical claims, whereas others claims repricing services base their methodologies on usual and customary rates or Medicare rates.

146.    Zelis and other claims repricing services are mere bit players compared to MultiPlan.  In 2022, Zelis processed approximately 2 million claims for repricing.  According to a June 28, 2023 presentation, in 2022 MultiPlan processed 546 million claims, accounting for $155 billion in claims.

147.    The market for reimbursements paid by commercial insurers to healthcare providers for out-of-network medical services is protected by high barriers to entry.  Commercial health insurance in the United States has long been a highly concentrated industry, with a small number of large insurers dominating the market.  According to Forbes, in 2021 the top 15 healthcare insurance companies controlled almost 60% of the entire health plan enrollment in the United States.  According to MultiPlan, all 15 of these insurance companies (and hundreds more as well) have agreed with MultiPlan to use its claims repricing service, along with hundreds of additional insurance companies and payors throughout the United States.

148.    Indeed, during a trial, John Haben, the former Vice President of Networks at UnitedHealthcare, agreed that "MultiPlan services [are] widely used in the industry."

149.    This high collective market concentration of the members of the MultiPlan Cartel is probative circumstantial evidence of agreement or agreements to conspire.  This is because it is this dominant collective market power that has allowed the MultiPlan Cartel to impose anticompetitive effects on the entire relevant market.

150.    In addition to this collectively dominant market power, each insurance company has complete buyer-side market power in the submarket for reimbursements of out-of-network healthcare services provided to its own insureds.

151. When a healthcare provider like AHS provides out-of-network services to a patient, its only option for seeking reimbursement for those services is to submit a claim to the particular health insurance company that administers the insurance plan in which that patient is enrolled. Thus, when AHS provides out-of-network services to a patient insured by Cigna, for example, it has no choice but to seek reimbursement from Cigna, and no other insurance company or payor is a viable source of reimbursement.

152. As a result, each health insurance company has complete buyer-side power over the reimbursement of out-of-network services provided to its own insureds. When a health insurance company agrees with MultiPlan on the methodology for suppressing reimbursements for such services, it is entering into a price-fixing agreement backed by complete market power in the relevant submarket, leaving healthcare providers like AHS with no practicable option but to accept the artificially suppressed reimbursement that MultiPlan's methodology generates.

**b.** **High Barriers to Entry**

153. There are high barriers to entry into the U.S. Commercial Reimbursement Market.

154. To even gain a foothold, new entrants face formidable challenges. They need to be able to bear the extreme expenditures of time and money required to develop a network of healthcare providers large enough to compete as a commercial healthcare insurer. Even if a new entrant opted not to develop an insurance network, there would still be significant capital outlays required in order to operate as a commercial healthcare payor. They then face the challenge of contending with the economies of scale enjoyed by the large incumbent insurers. Establishing name recognition in an industry occupied by long-entrenched and well-recognized major players presents an additional hurdle.

155. New health insurance networks also face an actuarial risk. If they cannot balance claims paid and revenue generated through premiums or network access fees (such as ASO fees), their capital reserves can quickly be depleted.

156. There are also steep regulatory hurdles to market entry. The provision of health insurance is highly regulated at the federal level and each state has its own varying regulations for the industry, leading to a patchwork system that is difficult for new entrants to navigate. This patchwork is also ever-changing, as new legal and regulatory requirements are created on a regular basis.

157. Even if a new entrant is initially successful, it must survive long enough to develop a broad base of business which allows it to effectively spread risk amongst its insureds.

158. These barriers to entry further cement the dominance of the MultiPlan Cartel by ensuring that new entrants who reject the MultiPlan Cartel's price-fixing scheme cannot undermine the cartel's ability to impose artificially low reimbursement rates on healthcare providers for out-of-network services.

159. Moreover, there are high barriers to entry with respect to repricing services. In order to develop a third-party repricing service, a new entrant would need to develop source code and algorithms that effectively reprice out-of-network claims without infringing MultiPlan's patents, develop contractual relationships with the hundreds of commercial insurance networks, invest tremendous sums of money in server space and other equipment necessary to operate the repricing service at scale, and commit significant resources to constantly improving its repricing algorithms and software. As a result, it is unlikely that any company could effectively disrupt MultiPlan's position as the repricing service for all major commercial insurance networks.

160.    These dual high barriers make it unlikely that a new entrant could disrupt the MultiPlan Cartel.  Therefore, these high barriers to entry in a relevant market support an inference of collusive agreements.

### c.    Motive to Conspire

161.    MultiPlan and the members of the MultiPlan Cartel have a massive financial motive to suppress reimbursement payments for out-of-network service.  MultiPlan is paid a percentage of the underpayment to healthcare providers.  In other words, it only makes money if the cartel is successful in suppressing out-of-network reimbursement payments; and the more the cartel suppresses, the more MultiPlan gets paid.  The percentage of savings that MultiPlan's competitors pay it for suppressing these claims can be significant.   At one point, UnitedHealthcare paid MultiPlan 9.75% of "savings" as a fee for MultiPlan suppressing out-of-network reimbursements. The gross payments to MultiPlan can also be significant.   In one year, UnitedHealthcare paid MultiPlan $330 million for MultiPlan's assistance in suppressing out-of-network reimbursement claims.  That $330 million payment accounts for up to 20% of MultiPlan's annual revenue.

162.    Likewise, the insurance company Co-Conspirators in the MultiPlan Cartel are incentivized to suppress payments to healthcare providers to increase their own profits.  For example, in an internal email, UnitedHealthcare executives stated that by "driving all OON [out-of-network] claims to a more aggressive pricing," UnitedHealthcare could generate more profits than if it continued paying out-of-network claims at usual and customary rates.

163.    The motives of MultiPlan and its Co-Conspirators are aligned because the less the MultiPlan Cartel pays to healthcare providers, the more revenue and profits they get to keep for themselves and split pursuant to their anticompetitive agreements.  As MultiPlan itself stated in a presentation to investors, its payor-customers' "interests are completely aligned" with its own.

164.    While companies are disincentivized from entering into cartel agreements by U.S. antitrust law, MultiPlan strongly implies to its competitors that its repricing scheme is entirely legal by offering to enter into formal contracts for those repricing services.

### d.    Prior Industry Collusion

165.    It is easier for firms in a market to conspire with one another if they have done so before.  The industry participants know one another and know that they can trust each other to conspire and not alert the government to the existence of the cartel.  That is the case here.

166.    Because commercial health insurance networks cannot collectively control out-of-network reimbursement rates through legally enforceable contracts (which is the way that they have traditionally controlled in-network reimbursement rates), they have attempted to enter into illegal cartel agreements to suppress out-of-network reimbursements on multiple occasions.

167.    In 2008, the New York Attorney General began investigating UnitedHealth Group, Inc.'s subsidiary, Ingenix.  The New York Attorney General's investigation showed that competing commercial health insurers were sending detailed information on their out-of-network claims to Ingenix to be included in a database that was used to calculate out-of-network reimbursement rates for commercial health insurers.  The Attorney General's investigation showed that Ingenix's database resulted in out-of-network claims being underpaid by 10% to 28% depending on the service involved.

168.    On January 13, 2009, UnitedHealth Group entered into a settlement with the New York Attorney General under which UnitedHealth Group agreed to shut down the Ingenix database and contribute $50 million toward the creation of a new, independent database that would house more aggregated information.  That database became known as FAIR Health.

169.     On January 15, 2009, Aetna entered into a settlement with the New York Attorney General under which it agreed to end its relationship with Ingenix and to contribute $20 million toward the creation of FAIR Health.  Similarly, on February 18, 2009, WellPoint, Inc. agreed to end its relationship with Ingenix and pay $10 million toward the creation of FAIR Health.  Other commercial health insurance companies also entered into settlements that required them to end their relationship with Ingenix in 2009.

170.     The Ingenix scheme also led to civil settlements of class action lability.  For instance, UnitedHealthcare paid $350 million to settle a class action.  As part of the civil settlement, UnitedHealthcare agreed to use the FAIR Health database for a period of time.  After that time period expired, UnitedHealth agreed to join the MultiPlan Cartel.

### e.     Opportunities to Conspire

171.     The MultiPlan Cartel also has ample opportunities to conspire, which support an inference of agreements to conspire.

172.     MultiPlan itself facilitates extensive private communications between competing health insurance networks which provide the setting and opportunity for them to conspire.

173.     MultiPlan maintains a Client Advisory Board which hosts annual multi-day retreats for health insurance company executives and regularly schedules other events bringing MultiPlan's Co-Conspirators together.

174.     In 2019, MultiPlan hosted a Client Advisory Board meeting at the luxury spa resort Montage Laguna Beach in Orange County, California.   Executives from MultiPlan, UnitedHealthcare, Aetna, Cigna, Humana, and several other commercial insurers attended the event.

175. UnitedHealthcare executive Rebecca Paradise testified that the participants in these meetings, "[t]ypically . . . talk about things they've implemented, other things they're looking at."

176. Presentations by MultiPlan at Client Advisory Board retreats cover cost reductions secured by MultiPlan through its claims repricing service.

177. MultiPlan also uses the Client Advisory Board meetings to draw new members into the MultiPlan Cartel. According to a 2017 MultiPlan document, the 2015 Client Advisory Board meeting featured prospective clients seated next to existing clients at dinner for this purpose.

178. From September 26–28, 2021, MultiPlan's Client Advisory Board returned to the Montage Laguna Beach resort for another retreat.

179. Upon information and belief, MultiPlan has hosted other such Client Advisory Board meetings on a regular basis, facilitating collusion among the members of the MultiPlan Cartel.

180. The road shows hosted by MultiPlan provide additional opportunities for the members of the MultiPlan Cartel to conspire.

181. Members of the MultiPlan Cartel have extensive additional opportunities to conspire through other industry linkages. For example, many of them, including most of the largest commercial health insurance payors, are members of industry associations such as AHIP (formerly "America's Health Insurance Plans"). Co-Conspirators including Aetna, Centene, Cigna, CVS Health, Elevance, HCSC, Humana, and many others are members of AHIP.

182. As AHIP states, it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests."

183. AHIP's Board of Directors is a "who's who" of MultiPlan's Co-Conspirator executives, including:

- Gail K. Bourdreaux, President and CEO of Elevance;

- Bruce D. Broussard, President and CEO of Humana;

- David Cordani, Chairman and CEO of Cigna;

- Sarah London, CEO of Centene;

- Karen S. Lynch, President and CEO of CVS Health (the parent company of Aetna);

- Maurice Smith, President, CEO, and Vice Chair of HCSC.

184.    AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in private, closed-door meetings.

185.    In 2023, MultiPlan sponsored AHIP's Annual Conference.  Upon information and belief, MultiPlan representatives attended AHIP's 2023 Annual Conference from June 13–15 in Portland, Oregon.

186.    A California federal court examining the Ingenix scheme concluded that plaintiffs challenging Ingenix's relationship with many of the same Co-Conspirators as in this Litigation sufficiently alleged a *per se* horizontal price-fixing agreement, in significant part based upon the opportunities to conspire provided by their overlapping membership in AHIP and participation in AHIP events.  *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002, 1028 (C.D. Cal. 2011).

187.    The fact that members of the MultiPlan Cartel regularly gather together in closed-door retreats such as MultiPlan's Client Advisory Board meetings, at MultiPlan's road shows, and at industry events such as AHIP's conferences, board meetings, and committee meetings is circumstantial evidence that their parallel conduct is part of a common scheme to suppress reimbursement rates.

### f.      Actions Against Self-Interest

188.      Commercial health insurance networks that joined the MultiPlan Cartel have engaged in actions against self-interest in at least two ways.

189.      First, the very agreements between MultiPlan and the commercial health insurance networks are economically irrational absent coordination.  If a single insurance network entered into an agreement with MultiPlan to shift away from the UCR methodology and drastically underpay out-of-network claims, healthcare providers would simply refuse to treat insureds of that network altogether (absent a scenario requiring treatment, such as emergency services).  As a result, the health insurance network would face serious harm to the value and breadth of their insurance offering as healthcare providers refuse treatment, ultimately leading to a loss of customers for the insurance network.

190.      Such an agreement, standing alone, would also expose a health insurance network to significant time and cost expenditures associated with repricing negotiations.  While healthcare providers cannot effectively negotiate with the MultiPlan Cartel due to the volume of MultiPlan repricing offers, a single insurance network acting alone would face significant pushback from providers.  The insurance network acting alone would also be less likely to secure deals to bring healthcare providers in-network, further reducing the value and potential earnings of the insurance network.

191.      These obvious impacts would reduce profits significantly more than any savings generated by the out-of-network underpayment agreement with MultiPlan.  The only way the agreement with MultiPlan is not economically self-defeating is if all insurance networks agree to join the MultiPlan Cartel.

192.    Second, the commercial health insurance networks which have joined the MultiPlan Cartel have refrained from engaging in self-interested, unilateral conduct that would have destabilized the cartel.

193.    For example, MultiPlan's competitor-clients have abandoned efforts to in-source claims repricing activities despite the vast savings that such efforts would generate and—in at least one case—despite spending considerable sums actually developing an alternative claims repricing product.

194.    As the nation's single largest commercial health insurance provider, UnitedHealthcare could easily analyze its own historical claims database to ascertain the most efficient pricing levels for out-of-network reimbursements.  It could then reprice claims received from healthcare providers based upon that data.  This would allow UnitedHealthcare to eliminate MultiPlan as a middle man, saving as much as 9.75% on each repriced out-of-network claim, an amount equal to hundreds of millions of dollars per year.

195.    In 2021, UnitedHealthcare created a product to do just that.  It was known internally as Naviguard.  One analyst described Naviguard as "an in-house replacement for MultiPlan."

196.    UnitedHealthcare developed a "roadmap" to terminate its contract with MultiPlan by 2023 in anticipation of Naviguard coming online.  That plan was ultimately scrapped. UnitedHealthcare renewed its contract with MultiPlan in January 2023 instead.

197.    UnitedHealthcare's decision makes no economic sense absent a conspiracy. UnitedHealthcare, like all commercial payors, has a unilateral economic incentive to compete against other health insurance networks to ensure that its insureds can see any healthcare provider out-of-network and must therefore pay competitive reimbursement rates.  UnitedHealthcare developed Naviguard to assess and pay claims unilaterally consistent with that economic incentive.

Instead of following through with bringing Naviguard online, UnitedHealthcare abandoned the project and effectively recommitted itself to the MultiPlan Cartel by renewing its contract with MultiPlan to use MultiPlan's out-of-network claims suppression technology.

198.     UnitedHealthcare's expenditures on Naviguard and its subsequent decision not to bring claims repricing in-house and instead renew its contract with MultiPlan are actions against self-interest, which only make sense in the context of a horizontal conspiracy wherein MultiPlan is fixing prices amongst payors for out-of-network reimbursements.

### g.     Using Sweetheart Deals to Enforce the Cartel

199.     Because a cartel agreement is against public policy, members of the cartel cannot go to court to enforce their illicit agreement.  As a result, they need to create informal structures of detecting attempts to disrupt the cartel agreement and ways of enforcing the cartel agreement by heading-off those attempted disruptions.

200.     UnitedHealthcare's plan to abandon the MultiPlan Cartel and to use its in-house Naviguard system to reprice out-of-network claims was one such attempted disruption to the cartel agreement.  Having the largest healthcare payor in the United States defect from the MultiPlan Cartel would inevitably destabilize the agreement and might cause other payors to reevaluate their participation in the cartel.

201.     So, MultiPlan bought off UnitedHealthcare with a sweetheart deal.  Upon information and belief, in 2022 MultiPlan and UnitedHealthcare negotiated a new contract for repricing services that went into effect in 2023.  MultiPlan gave UnitedHealthcare extremely favorable commercial terms, allowing UnitedHealthcare to capture nearly all of the underpayments generated by MultiPlan's claims suppression methodology.

202. This sweetheart deal was so good for UnitedHealthcare that it caused a temporary drop in MultiPlan's financial performance, which MultiPlan executives discussed during quarterly earnings calls with investors in the fourth quarter of 2022 and the first quarter of 2023. In MultiPlan's 2022 fourth quarter earnings call, MultiPlan's CEO Dale White explained, "we have been anticipating that a multiyear contract renewal with one of our largest customers would mute our 2023 revenue growth" and that the contract renewal would be "a headwind against growth in 2023."

203. As a result of MultiPlan's efforts to keep its largest customers using its repricing tools and in the cartel, in the first quarter of 2023 MultiPlan experienced a 20.6% drop in revenues versus the first quarter of 2022 and a 30.7% drop in earnings before interest, taxes, depreciation, and amortization versus the first quarter of 2022.

204. However, MultiPlan was willing to sacrifice short-term revenues and profits in order to stabilize the cartel and keep the largest cartel members in the fold. As MultiPlan CEO Dale White explained during MultiPlan's earning call for the first quarter of 2023, renewing repricing agreements with the largest healthcare payors in the United States made MultiPlan's leadership "increasingly confident that our revenues are stabilizing and poised for growth over the next several years."

205. In an apparent effort to sweeten the deal and keep UnitedHealthcare in the cartel, on June 27, 2023, MultiPlan announced that John Prince, the recently retired President of Optum, UnitedHealthcare's health services subsidiary, would join MultiPlan's board of directors.

206. MultiPlan's efforts to enforce the cartel agreement by buying the loyalty of one of the largest payors in the cartel appears to have worked. In an August 2, 2023 press release, the CEO of MultiPlan hailed the second quarter of 2023 as an "inflection point" in which MultiPlan

"deliver[ed] second quarter results at the high end of our expectations," leading MultiPlan to increase its revenue guidance for investors for 2023.

207.    MultiPlan's willingness to sacrifice short-term profits does not make economic sense absent its knowledge that perpetuating its conspiracy to underpay healthcare providers would pay off in the long run.

### h.    Exchange of Competitively Sensitive Information

208.    Competitors like the members of the MultiPlan Cartel are unlikely to exchange large volumes of competitively sensitive pricing information in the absence of a cartel agreement.

209.    However, MultiPlan and competing commercial health insurance companies have agreed to exchange data regarding claims submitted by healthcare providers, reimbursement offers made by commercial health insurance companies in response to those submitted claims, and the actual amount paid in response to those claims.

210.    The information exchanged by MultiPlan and the other members of the MultiPlan Cartel is exactly the type of information exchange that the courts have recognized is likely to have anticompetitive effects. *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 441, n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anti-competitive effects."); *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001) (Sotomayor, J.) ("Price exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive.").  First, the data exchanged is real-time pricing data, transmitted to MultiPlan automatically and expeditiously through electronic data links from its health insurance clients. Second, the data exchanged is specific to commercial insurance claims.  Third, the data exchanged is not publicly available—although hospitals do publish some pricing information online, it is not

updated in real-time. Fourth, the data is granular and unblinded—meaning that MultiPlan *knows exactly* what its competitors are charging for specific medical services and procedures.

211. Here, MultiPlan uses this data to explicitly share confidential pricing information between members of the MultiPlan Cartel in order to fix prices. As discussed previously, when seeking to establish UnitedHealthcare's out-of-network reimbursement rates, MultiPlan told UnitedHealthcare that prices set at 350% of Medicare rates would "be in line with another competitor" and "leading the pack along with another competitor."

212. Competing companies would not risk sharing individual, real-time, and competitively sensitive pricing information with their rivals. Nor would competing companies pay millions of dollars to MultiPlan while simultaneously sharing their competitively sensitive information with MultiPlan absent an agreement to restrain competition. The information exchange operated by MultiPlan and the other members of the MultiPlan Cartel is more consistent with an agreement to restrain trade than competition on the merits. Therefore, this type of information exchange is circumstantial evidence of a cartel agreement among competitors.

### i. Customary Patterns, Formulas, and Leadership

213. MultiPlan has a long history of facilitating and stabilizing the MultiPlan Cartel.

214. MultiPlan boasts that it is "deeply embedded into [its Co-Conspirators'] claims platforms."

215. MultiPlan emphasizes the long-term nature of its relationships with its analytics and claims repricing clients. In a June 28, 2023 investor presentation it stated that its "Average Length of Large Customer Relationships" was over 25 years.

216.     In the words of Churchill Capital's Chief Executive Officer, Michael Klein, MultiPlan has achieved "payer lock" due to MultiPlan's deep and long-standing integration into its clients' claims processing operations.

217.     For over a decade, commercial health insurance providers with collective dominance in the U.S. Commercial Reimbursement Market have been locked into multi-year contracts to use MultiPlan's claims repricing services.  MultiPlan's consistent public statements trumpeting this high level of market participation and promoting acceptance rates of its reimbursement offers in the high 90th percentile provide reassurances regarding the stability of the cartel to its members.

218.     The MultiPlan Cartel has a long-standing and well-functioning ringleader in MultiPlan.  MultiPlan takes the lead in recruiting new members into the cartel, shares information with them about the advantages of collusive pricing, threatens that they will suffer financial disadvantage by not joining or defecting from the cartel, and enforces price discipline by encouraging cartel members to match the  "aggressive" repricing settings of their competitors.

219.     These customary patterns, formulas, and leadership are circumstantial evidence of agreements and a conspiracy to suppress reimbursement rates.

**B.     Alternatively, the MultiPlan Cartel Is a "Hub-and-Spoke" Cartel Agreement**

220.     Even if the MultiPlan Cartel were not a horizontal price-fixing agreement between competitors, it would be a "hub-and-spoke" agreement that is likewise *per se* illegal under the Sherman Act.  Under this mode of analysis, MultiPlan is the "hub" of the conspiracy and the Co-Conspirator insurance companies' agreements with MultiPlan to reprice their claims are the "spokes."  The "rim" of the conspiracy is the agreement between the Co-Conspirator insurance

companies to use MultiPlan's repricing methodologies to suppress out-of-network reimbursement payments.

221.    Prior to the Co-Conspirators joining the MultiPlan Cartel, commercial health insurance providers made several attempts to underpay healthcare providers through unilateral action.  For example, before it joined the MultiPlan Cartel in 2017, in May 2015 UnitedHealth paid $11.5 million to resolve claims that it used down-coding software algorithms, stalling tactics, and other unfair business practices to underpay healthcare providers in Connecticut, New York, North Carolina, and Tennessee.  Likewise, in September 2015, UnitedHealth agreed to pay $9.5 million to settle claims that it systematically underpaid out-of-network claims in California. However, these unilateral efforts could be thwarted by healthcare providers, because the providers could elect to provide non-emergency care to patients from other health insurance networks.

222.    Commercial health insurance companies realized the need for collective action. Initially, UnitedHealthcare attempted to solve that collective action problem using its subsidiary, Ingenix.  However, when the New York State Attorney General shut down the Ingenix scheme, commercial health insurers needed a new way to agree among themselves to underpay out-of-network claims.

223.    MultiPlan solved that problem.  It advertised itself to insurance companies as a hub that could be used to collectively reduce out-of-network payments to healthcare providers.  For example, as noted above, MultiPlan told UnitedHealthcare that many of UnitedHealthcare's competitors were using MultiPlan's repricing services to slash out-of-network reimbursement rates.  MultiPlan further advised UnitedHealthcare on the pricing levels and methodologies adopted by its competitors: it told UnitedHealthcare that prices set at 350% of Medicare rates would "be in line with another competitor" and "leading the pack along with another competitor."

MultiPlan eventually reached an agreement to reprice UnitedHealthcare's claims which put UnitedHealthcare, in its own words, in the "middle of the pack of its peers." Thus, one spoke of the conspiracy was formed—the agreement between MultiPlan and UnitedHealthcare to suppress out-of-network reimbursements in reference to their competitors' pricing levels and methodologies.

224. MultiPlan persuaded the vast majority of large competing health insurance companies to become "spokes" in the conspiracy through similar inducements. MultiPlan has contracts with the "top 15" health insurance payors in the nation and agreements with over 700 insurance payors to reprice their claims. Each of these contracts between a health insurance payor and MultiPlan forms another "spoke" in the MultiPlan Cartel's "hub-and-spoke" conspiracy.

225. MultiPlan uses similar tactics to facilitate collusion along the rim of the alleged hub-and-spoke conspiracy. MultiPlan informs each of the payors that other major payors are using MultiPlan's repricing services to suppress out-of-network claims, that those payors are generating substantial revenues by underpaying out-of-network claims, and that the payor can bring itself into "alignment" with the rest of the industry and be in the "middle of the pack" on out-of-network claims suppression by working with MultiPlan. Thus, each of the payors knows that its competitors have considered or are considering the same terms offered by MultiPlan—i.e., suppressing out-of-network claims payments and splitting the revenues generated by doing so. Each payor has a strong motive to enter into the conspiracy because they know that without substantially unanimous action, agreeing to unilaterally cut out-of-network reimbursement payments would be economically self-defeating. And, in the end, each payor agrees to the same course of conduct (suppressing out-of-network claims via an agreement with MultiPlan), which

constitutes an important departure from their prior practice of using UCR or FAIR Health benchmarks to compete against one another on out-of-network reimbursement payments.

226.    Importantly, there is no valid business reason for each of MultiPlan's Co-Conspirators to have entered into agreements with MultiPlan to cut reimbursements paid to out-of-network healthcare providers.  Larger payors could have created their own in-house repricing tools (and some came close to doing so).  Smaller payors could have used the FAIR Health benchmark to reprice claims.  The only plausible explanation for every healthcare payor of any consequence agreeing to use MultiPlan's out-of-network claims suppression methodology is that MultiPlan provided them with assurances that they could agree to do so with the common understanding that they would not be undermining one another via competition on reimbursement rates.

227.    As discussed above, there is extensive circumstantial evidence that health insurance companies have agreed with each other to use MultiPlan's "repricing" methodology to suppress out-of-network reimbursement payments to healthcare providers, thus forming the "rim" of the conspiracy.  This includes evidence that MultiPlan facilitated a parallel transition among insurance companies from a competitive regime to a coordinated regime, and a variety of "plus factors" that tend to exclude the possibility that this parallel conduct was the result of independent action.

## C.    The MultiPlan Cartel Harms Competition Throughout the Relevant Market and Has No Procompetitive Effects

228.    By underpaying healthcare providers throughout the United States, MultiPlan and the MultiPlan Cartel harmed market-wide competition in the U.S. Commercial Reimbursement Market.  Because the MultiPlan Cartel's agreement suppresses reimbursements paid to healthcare providers, like AHS, MultiPlan and the MultiPlan Cartel made lower reimbursement payments to

healthcare providers than the cartel members would have made but for the existence of the cartel agreement.  Were it not for the cartel, members of the MultiPlan Cartel would have competed against one another to provide adequate compensation to healthcare providers for out-of-network care so that they could guarantee their insureds access to a wide variety of healthcare professionals within or outside of their networks.

229.    In addition, faith-based and non-profit hospitals, such as AHS, have board and legal mandates to spend funds on community healthcare improvements, including free medical care and clinics.  Because AHS and other healthcare providers throughout the United States were systematically underpaid as a result of the MultiPlan Cartel, they have less funds to devote to those charitable efforts.

230.    Healthcare providers cannot avoid the anticompetitive effects of the MultiPlan Cartel.  Providers have no practical ability to reject MultiPlan's take-it-or-leave-it terms and attempt to negotiate a better reimbursement rate.  As one healthcare provider explained, "When we reject a [MultiPlan proposal], it takes months to get any payment and we never get paid more than the amount of the [original MultiPlan proposal]."

231.    MultiPlan also threatens to drop their reimbursements if healthcare providers do not accept their cut-rate offers.  In a fax to a healthcare provider, MultiPlan gave the provider eight days to respond to a low-ball offer.  But the fax warned, "Please note that if you do not wish to sign the attached proposal . . . this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient."  In other words, if the provider disagrees with MultiPlan's offer, MultiPlan will lower the reimbursement rate even further.

232.    While the state and federal laws discussed above establish procedures for providers to dispute reimbursement amounts through arbitration, the sheer volume of claims that are

underpaid by the MultiPlan Cartel make arbitrating each individual claim practically and financially impossible.

233.    MultiPlan also "erect[s] a bureaucratic layer so thick and complicated that few can navigate it." MultiPlan relies on the fact that medical billers overseeing a massive flow of out-of-network claims will not have the time to fight back on individual claims. MultiPlan disputes and reprices nearly every out-of-network claim, giving medical billers less than 10 days to respond to those offers. When a medical biller asks the insurer how MultiPlan reprices its claims, the insurance company explains that it is not responsible for MultiPlan's pricing. When the medical biller tries to negotiate with MultiPlan, MultiPlan tells the biller that it is not the insurer and does not have authorization to negotiate with the healthcare provider.

234.    The MultiPlan Cartel's overwhelming market power permits it to enforce strict compliance with its pricing offers. According to a 2018 MultiPlan study, 99.4% of all out-of-network claims for inpatient treatment that are repriced by Data iSight are accepted by healthcare providers. MultiPlan claims that as little as 2% of Data iSight's repricing recommendations are appealed for all claim types.

235.    In addition to suppressing payments to healthcare providers for out-of-network claims, the MultiPlan Cartel also harms consumers of healthcare services because (a) those underpayments limit the amount of revenue that healthcare providers can spend on improving care or offering charitable care and (b) those underpayments cause healthcare providers to fail and thereby limit the supply of healthcare goods and services available to consumers. For example, in a separate lawsuit filed in San Francisco County Superior Court, VHS Liquidating Trust alleges that Verity Health System went bankrupt as a result of the MultiPlan Cartel. On August 31, 2018, Verity Health System filed for Chapter 11 bankruptcy. As a part of that bankruptcy process, on

January 6, 2020, Verity Health System announced the closure of the St. Vincent Medical Center in Los Angeles, California.

236.    In addition, the MultiPlan Cartel's effect of slashing out-of-network reimbursements suppresses revenue for rural hospitals that are in serious danger of failing—cutting off a key source of healthcare goods and services for many communities. According to the Center for Healthcare Quality and Payment Reform, between 2005 and 2019 over 150 rural hospitals closed. Another 25 rural hospitals closed between 2020 and 2022, despite the COVID-19 pandemic driving record demand for hospital services. Many of the rural hospitals that are still operating are doing so on shoestring budgets. More than 600 rural hospitals, representing nearly 30% of all rural hospitals in the United States, are at risk of closing. Two hundred rural hospitals are at immediate risk of closing because they are losing money on patient services and have more debts than assets.

237.    Since rural hospitals treat fewer patients than urban and suburban hospitals, they have a higher cost of care per patient. As a result, many rural hospitals are at risk of closing because they receive inadequate reimbursements for their services. Therefore, the MultiPlan Cartel's agreement to suppress reimbursement rates to all healthcare providers, including rural hospitals, threatens to drastically cut the supply of healthcare services in several parts of the country. If rural hospitals fail because of the MultiPlan Cartel, the cost of healthcare will increase throughout the United States because patients in areas previously served by those hospitals will only seek acute medical care when they are experiencing very severe symptoms, raising the cost of care.

238.    Furthermore, the MultiPlan Cartel takes advantage of hospital emergency departments that cannot lawfully avoid the cartel's underpayment scheme.

239.    Emergency department utilization is extremely high throughout the United States. According to the United States Centers for Disease Control and Prevention, there were 131.2 million emergency department visits in 2020, equating to 40.5 visits per 100 people.  A total of 39.8 million emergency department visits were covered by some form of commercial health insurance network.

240.    As of 2018, there were approximately 4,500 emergency departments at hospitals throughout the United States staffed by approximately 45,000 physicians.

241.    Demand for emergency department medical services is highly inelastic. Patients often have little choice as to which hospital they are taken and are rarely able to avoid or defer emergency medical treatment.

242.    Emergency departments also play an increasing role in the provision of healthcare services.  From 1993 to the present, emergency department visits have grown faster than population growth, and emergency departments have become the primary way that patients are admitted to hospitals.

243.    Although emergency departments face increasing and inelastic demand, hospitals must serve all patients that come to the emergency department.  Under the federal Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §§ 1395dd(a)–(b), (d), and (h), hospitals and physicians who staff emergency medical departments have a duty to "provide for an appropriate medical screening examination" when an individual comes to the emergency department.  If "the individual has an emergency medical condition," then they are required to "stabilize the medical condition" without inquiry into "the individual's method of payment or insurance status."  *Id.*

244. Hospitals are also subject to civil liability for violating EMTALA. *Id.* § 1395dd(d)(2)(A). Under the law, "any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital" who negligently violates EMTALA is subject to civil monetary penalties of up to $50,000 per violation. *Id.* § 1395dd(d)(1)(B); *see also Hardy v. N.Y. City Health Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999) (EMTALA was designed "to prevent 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay").

245. State laws contain similar requirements. New York law requires hospitals to "assure that all persons presenting for emergency services receive emergency health care that meets generally accepted standards of practice," N.Y. Comp. Codes R. & Regs. Tit. 10, § 405.19(e)(1), while Florida law states that "[e]very general hospital which has an emergency department shall provide emergency services and care for any emergency medical condition when: (1) [a]ny person requests emergency services and care; or (2) [e]mergency services and care are requested on behalf of a person[.]" Fla. Stat. § 395.1041(3)(a). "In no event shall the provision of emergency services" by the hospital's emergency department "be based upon, or affected by, the person's . . . insurance status, economic status, or ability to pay for medical services[.]" *Id.* § 395.1041(3)(f). Any hospital official or physician who knowingly violates those statutory provisions may be charged with a second-degree misdemeanor. *Id.* § 395.1041(5)(c). In addition, state regulatory authorities may strip physicians of their medical license for failing to comply with those requirement and can impose an administrative fine of $10,000 per violation. *Id.* § 395.1041(5)(a).

246. Moreover, although commercial insurance networks typically require medical providers to seek preauthorization before providing certain medical services, hospitals do not need

to seek insurance preauthorization prior to providing emergency medical services. *See* 28 U.S.C. § 9816(a)(1)(A) (requiring that emergency services be covered "without the need for any prior authorization determination"); N.Y. Ins. Law § 3221(k)(4)(A)(i) ("Every group policy . . . shall include coverage for services to treat an emergency condition . . . without the need for any prior authorization determination"); Fla. Stat. § 627.64194(2)(A) (an insurer "[m]ay not require prior authorization" for emergency services).

247.    Because hospital emergency departments are required to treat all persons seeking emergency medical treatment, they rely on commercial insurance networks like the MultiPlan Cartel members to fairly reimburse them for out-of-network charges at usual and customary reimbursement rates.

248.    Courts recognize that this statutory requirement to treat all persons seeking emergency treatment is ripe for abuse by commercial health insurance networks. *See, e.g.*, *N.Y. City Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S.2d 540, 545 (N.Y. Sup. Ct. 2011) ("An insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment of the insurer's enrollees.").

249.    By colluding to underpay providers, reimbursing the minimum possible amount to still maintain relationships with hospitals and emergency healthcare providers, the MultiPlan Cartel has been systematically bleeding emergency rooms dry.

250.    This dynamic is only exacerbated in times of national public health crisis like the COVID-19 pandemic. While hospital emergency departments generate a massive amount of out-of-network claims from saving patient lives, the MultiPlan Cartel generates massive profits for MultiPlan and other cartel members by systematically underpaying those out-of-network claims.

251.    As a result of the MultiPlan Cartel, commercial insurance networks typically pay 50% or less of the value of emergency department out-of-network claims.  According to an analysis of a sample of 10% of Florida emergency department visits between 2014 and 2015, the average emergency physician charge was $679.  That charge is not exorbitant.  FAIR Health, a database that contains publicly available data based on billions of health insurance claims, calculates the 80th percentile charge for a high acuity emergency department visit in Florida to be $950.  Despite that fact, commercial insurance networks' average out-of-network payment on those claims was $307.  As a result, an emergency physician in Florida provides an average of $138,000 in uncompensated care each year.

252.    MultiPlan attempts to justify its behavior as intended to keep prices down for healthcare consumers, but that is not the case.  As an August 5, 2020 analysis explained: "Theoretically, MultiPlan's harsh negotiation tactics should be good for rising American health costs; insurers are supposed to lower costs by negotiating lower prices on behalf of the patient. But instead, MultiPlan acts like a mafia enforcer for insurers, forcing doctors to accept low payments while insurance premiums for patients . . . somehow continue to rise."

253.    In fact, although MultiPlan claims that its out-of-network claims suppression tools help decrease healthcare costs, the data shows otherwise.  According to the Centers for Medicare and Medicaid Service, in 2016, a year before several large health insurance companies joined the MultiPlan Cartel, private health insurance expenditures in the United States were $1.03 trillion. By 2021, private health insurance expenditures in the United States were $1.21 trillion, a 17.48% increase.  By 2025, private health insurance expenditures in the United States are projected to be $1.53 trillion, a 48% increase over 2016.  In short, MultiPlan's "cost containment" justification

fails as a factual matter—private health insurance expenditures are ballooning regardless of the MultiPlan Cartel.

254.    While MultiPlan and its Co-Conspirators attempt to justify the MultiPlan Cartel as tackling exorbitant fees charged by hospitals, they tell a different story when they are testifying under oath.    During a trial, John Haben, the former Vice President of Networks at UnitedHealthcare, testified that despite UnitedHealthcare's public position that emergency department charges are "egregious," emergency department bills are actually "not a lot of money" when "you put it in the perspective of saving somebody's life."  When Mr. Haben was informed that an emergency department had charged $1,428 for a patient's medical care and that UnitedHealthcare, using MultiPlan, had only offered to pay $254 for that claim, Mr. Haben testified that "$1,400 is not a lot of money," the emergency department bill was "reasonable," and UnitedHealthcare's MultiPlan-induced offer to pay $254 for that out-of-network service was "low."

255.    Mr. Haben is right:  emergency care is highly valuable and can lower total medical spending for acutely ill patients.  A 2020 study in *JAMA Network Open* using data for Medicare beneficiaries treated between 2011 and 2016 found that the total cost of all health care for Medicare beneficiaries admitted to the emergency department declined over that six-year period.  *See* Laura G. Burke, *et al.*, *Trends in Costs of Care for Medicare Beneficiaries Treated in the Emergency Department from 2011 to 2016*, JAMA Network Open (Aug. 2020).  As the study's lead author, Dr. Laura Burke, an emergency physician at Beth Israel Deaconess Medical Center, explained in a press release accompanying the paper's publication: "Too often discussion of the cost of emergency care fail[s] to consider the bigger picture—that spending on emergency care can save lives, alleviate suffering and in some instances avoid the need for more expensive hospitalization.

. . . Emergency physicians treat anyone, anytime and serve as the safety net for the nation's acute care system."

256.    Therefore, the MultiPlan Cartel harms competition by systematically underpaying healthcare providers, limiting the amount of revenue that healthcare providers can spend on improving and expanding care, and putting at-risk healthcare providers closer to bankruptcy. MultiPlan cannot justify its conduct.  MultiPlan does not contain costs.  Its cartel has taken advantage of a rapidly growing healthcare sector to enrich itself at the expense of doctors, nurses, and patients.  And the life-saving care provided by healthcare providers is not "exorbitant" as the cartel likes to claim (until they are sworn to tell the truth).

**D.    The MultiPlan Cartel is Expanding to Suppress In-Network Reimbursement Under Its "MultiPlan 3.0" Scheme**

257.    MultiPlan and its Co-Conspirators are not content with suppressing reimbursement of out-of-network claims.  In a 2020 investor presentation, Mr. Tabak (as the then-CEO) outlined the company's vision for "MultiPlan 3.0."

258.    With MultiPlan 3.0, MultiPlan plans to "[e]xtend [its] [p]latform" by "[s]caling adjacent customer segments."  In other words, MultiPlan intends to extend use of Data iSight and its other claims suppression tools "into [the] in-network cost management segment."  MultiPlan estimates that extending its analytics business into the in-network segment will generate up to $1.15 billion in additional annual revenue and up to $720 million in additional annual profits.

259.    MultiPlan describes MultiPlan 3.0 as a three-part "Enhance, Extend, and Expand" strategy.  This strategy focuses on growth in "existing and key adjacent markets" and aims to "identify greater savings."  MultiPlan is explicit about who exactly is getting those savings—the "Enhance" element refers to enhancing MultiPlan's "cost containment product" to "generate more

savings for payor customers." These so-called "savings" for payors (MultiPlan's Co-Conspirator customer base) means decreased compensation for providers.

260. MultiPlan predicts that MultiPlan 3.0 will result in as "more savings for payor customers" and double the revenue for MultiPlan.

261. On August 28, 2020, MultiPlan announced a new executive structure that would become effective following its merger with SPAC-vehicle Churchill Capital. It claimed that the new structure would "facilitate [the] success" of MultiPlan 3.0.

262. In its formal announcement of the merger between Churchill Capital and the parent of MultiPlan, Inc. on October 8, 2020, MultiPlan claimed the deal would position MultiPlan to "execute on its growth strategy, which aims to significantly grow the company's total addressable market from approximately $8 billion to up to $50 billion." It again cited MultiPlan 3.0, a strategy that "aims to drive growth by improving existing products and commercial capabilities, scaling offerings to adjacent customer segments, and adding new product offerings through acquisitions and investments in new technologies."

263. MultiPlan reported that it was seeing "strong consecutive quarterly growth" as it began to roll out MultiPlan 3.0. MultiPlan further touted that in the year 2020, it processed $105.4 billion in billed charges and identified approximately $18.8 billion in potential "savings." That is, during the height of the COVID-19 pandemic, MultiPlan and its Co-Conspirators collectively pocketed up to $18.8 billion of the value of services that could have gone to providers on the front lines.

264. During its May 27, 2021 annual stockholder meeting, MultiPlan explained that Discovery Health Partners would help "expand [its] services and customer footprint" and enable MultiPlan to develop cost-management tools similar to Data iSight for "in-network claims."

265.    MultiPlan appears to have escalated its efforts in recent months.  As MultiPlan's current CEO, Dale White, told investors on a February 28, 2023 earnings call: "[I]n 2023, we plan to launch a new data and analytics service line which we believe holds transformative potential for MultiPlan. . . . The data and analytics service line will help us . . . expand beyond our commercial health out-of-network footprint by enabling us to address new flows of in-network commercial and Medicare Advantage charge volumes and claims, which we anticipate to increase significantly for MultiPlan by year-end 2023."

266.    During a March 2, 2023 presentation, Mr. White elaborated that the in-network claims suppression capability was a part of a "wish list" from MultiPlan's competing healthcare networks.  Indeed, Mr. White explained that MultiPlan and its competitors are "sitting across the table collaborating on . . . what we can do to . . . generate more value and savings for them[.]"  In other words, all members of the MultiPlan Cartel agree that this new product will further enhance the anticompetitive goals of the cartel.

267.    MultiPlan also shared its goal to improve its technological capabilities by the end of 2023 so that it can "take a claim that [] comes in our front door and route[] [it] to the solution that" most effectively slashes provider reimbursements.  Essentially, MultiPlan seeks to ensure that it is always maximizing the amount it can suppress out-of-network claims.

268.    MultiPlan has already begun implementing its plan to conspire with other health insurance networks to slash reimbursements paid to in-network healthcare providers.  In a customer presentation, MultiPlan bragged that it had repriced 65 million claims annually through its PPO network.  It also bragged that, in 2022, it repriced 1.75 million in No Surprises Act claims, processed $155.2 billion in medical charges, and identified $22.3 billion in potential "savings."  That is, because of the MultiPlan Cartel, providers were paid up to $22.3 billion less in 2022.

MultiPlan has been transparent about the motivations for its new in-network product. It wants to deepen its collusive relationships with competing networks to short-change and underpay healthcare providers for in-network claims as well as out-of-network claims. As CEO Dale White explained at the March 14, 2023 Barclays Global Healthcare Conference, "the opportunity for us in terms of new revenue is really looking at our existing customers"—i.e., competing networks—"and collaborating with them on ways to generate more savings"—i.e., ways to pay healthcare providers less.

###### E.    AHS Has Suffered Antitrust Injury and Has Antitrust Standing

269.    Regardless of whether the MultiPlan Cartel agreement is characterized as an agreement between horizontal competitors, a hub-and-spoke agreement, or a vertical agreement, AHS has antitrust standing to bring its claims against MultiPlan and has suffered a classic antitrust injury.

270.    AHS suffered direct damages to its business and property as a result of the MultiPlan Cartel agreement. AHS has sustained, and continues to sustain, significant economic losses from underpayments made by members of the MultiPlan Cartel and directly caused by the MultiPlan Cartel agreement. AHS will calculate the full amount of such underpayment damages after discovery and upon proof at trial. Unless the conduct of MultiPlan and other members of the MultiPlan Cartel is stopped, AHS will incur future damages via those underpayments.

271.    MultiPlan's own filings with the SEC illustrate the harm that the MultiPlan Cartel has caused to AHS. According to the May 10, 2023 Quarterly Report that MultiPlan filed with the SEC, MultiPlan processed $18.4 billion in charges from commercial health plans in the first three months of 2023. During that period, MultiPlan identified $5.3 billion in "savings"—i.e., underpayments—that its competitors could make to healthcare providers. MultiPlan estimates that

its analytics tools—i.e., its agreement with competitors—result in a 61–81% underpayment to healthcare providers as a percentage of total charges processed. These underpayment percentages and the billions of dollars in underpayments generated by the MultiPlan Cartel each year indicate that the cartel has caused massive harm to healthcare providers throughout the United States and to AHS, specifically.

272. MultiPlan's repricing tools also generate significant underpayments when compared to traditional methods of repricing out-of-network healthcare claims. An April 2020 study published by the Office of the New York State Comptroller compared UnitedHealthcare's average reimbursement payment to a healthcare provider for an out-of-network claim using a UCR methodology was $225; the average payment using MultiPlan repricing was $96—a 57% difference. The same study found that, depending on the service provided, reimbursement payments made using MultiPlan repricing were 1.5 to 49 times lower than UCR rates for that service.

273. A sampling of AHS's claims payment data illustrates how the MultiPlan Cartel causes repeated economic harm to AHS. In nearly every case, MultiPlan starts by offering to underpay AHS's claims by 80–90%.

| Date of Service | AHS Submitted Claim | MultiPlan Allowed Amount | Percentage Underpayment |
|---|---|---|---|
| June 26, 2023 | $2,477.63 | $409.23 | 83.5% |
| June 26, 2023 | $6,461.72 | $602.68 | 90.7% |
| June 27, 2023 | $4,444.07 | $470.63 | 89.4% |
| June 28, 2023 | $5,753.57 | $783.73 | 86.4% |
| June 28, 2023 | $7,601.84 | $783.73 | 90.7% |
| June 28, 2023 | $8,413.86 | $899.22 | 89.3% |
| June 28, 2023 | $1,599.09 | $301.87 | 80.6% |
| June 28, 2023 | $7,790.57 | $602.72 | 92.3% |

| Date of Service | AHS Submitted Claim | MultiPlan Allowed Amount | Percentage Underpayment |
|---|---|---|---|
| June 28, 2023 | $3,177.07 | $470.64 | 85.2% |
| June 30, 2023 | $7,338.64 | $783.71 | 89.3% |
| July 1, 2023 | $5,662.18 | $783.71 | 86.2% |
| July 3, 2023 | $15,940.46 | $1,131.61 | 92.9% |
| July 4, 2023 | $1,801.99 | $301.87 | 83.2% |
| July 5, 2023 | $2,535.39 | $301.86 | 88.1% |
| July 5, 2023 | $5,025.21 | $607.69 | 87.9% |
| July 6, 2023 | $14,758.02 | $1,131.62 | 92.3% |
| July 6, 2023 | $13,163.06 | $920.82 | 93% |
| July 6, 2023 | $4,489.48 | $470.66 | 89.5% |
| July 6, 2023 | $4,623.27 | $602.70 | 87% |
| July 7, 2023 | $2,918.83 | $470.62 | 83.9% |
| July 8, 2023 | $3,093.29 | $470.63 | 84.8% |
| July 8, 2023 | $5,556.27 | $470.65 | 91.5% |
| July 9, 2023 | $9,925.87 | $602.68 | 93.9% |

274. Even if AHS were able to negotiate with MultiPlan over these repricing offers, the best it can hope for is being forced to accept an underpayment of 30% or more.

275. AHS's injuries are of the type that the antitrust statutes were intended to forestall. Namely, AHS was harmed because its employees were underpaid by members of the MultiPlan Cartel because MultiPlan and other members of the cartel agreed to suppress payments to healthcare providers for out-of-network claims. The Supreme Court, U.S. Courts of Appeals, and District Judges in this Court have long recognized that agreements to restrain pricing competition are illegal under Section 1 of the Sherman Act.

276. There are no more direct victims of the MultiPlan Cartel than AHS. AHS directly employs the healthcare providers that staff its hospitals. Those doctors and nurses provided

medical goods and services to patients at AHS facilities. AHS submitted claims directly to members of the MultiPlan Cartel for reimbursement. Acting on direction from MultiPlan and pursuant to their anticompetitive agreement, members of the MultiPlan Cartel systematically underpaid AHS for those claims. Were it not for the MultiPlan Cartel agreement, AHS would have been compensated fairly and at a competitive level for those claims.

277.    There is no potential for speculative damages, duplicative recovery, or complex apportionment of damages. Each claim that AHS submitted to members of the MultiPlan Cartel for out-of-network goods and services was underpaid compared to the amount that AHS would have been paid as a reimbursement but for the cartel agreement. When AHS was systematically underpaid for its out-of-network claims, it did not have the practical or legal ability to obtain the balance of those charges from the patient or any other payor. AHS does not engage in balance billing on those charges for several reasons. First, in December 2020, Congress enacted the No Surprises Act as a part of the Consolidated Appropriations Act of 2021. The No Surprises Act bans balance billing for out-of-network providers and facilities without prior authorization. Second, even before the passage of the No Surprises Act, state laws and regulations restricted AHS from balance billing for such a substantial volume of its charges. Therefore, AHS generally does not balance bill for out-of-network claims. Third, the MultiPlan Cartel explicitly conditions acceptance of its take-it-or-leave-it reimbursement payments for out-of-network claims on AHS not balance billing for those claims. So, by definition, every time that the MultiPlan Cartel underpaid AHS, the cartel also restricted AHS from seeking to balance bill for those same charges.

278.    AHS is the most efficient enforcer of the antitrust laws with respect to the MultiPlan Cartel. AHS was directly injured when it was underpaid for submitted out-of-network claims due to the cartel agreement. The damages that AHS suffered are not contingent, speculative, or

complex. Due to the MultiPlan Cartel's own conduct, and as a practical and legal matter, AHS cannot seek payment for these charges from any other source.

279. AHS suffered antitrust injury as a result of the MultiPlan Cartel. As explained above, the actions of MultiPlan and the MultiPlan Cartel have directly harmed AHS. For decades, federal courts have recognized that agreements between competitors to underpay providers for goods and services are illegal *per se* because buyers' cartels are so pernicious that they will almost always harm competition.

### F. Fraudulent Concealment

280. From at least July 1, 2017 through the present, MultiPlan and members of the MultiPlan Cartel have affirmatively and fraudulently concealed the existence of the MultiPlan Cartel from AHS by various means and methods.

281. MultiPlan colludes with its Co-Conspirators and competitors by entering into horizontal agreements to tamp down reimbursement payments to providers. AHS is not a party to those agreements. Due to non-disclosure and confidentiality clauses in the contracts, AHS did not access, and could not have reasonably accessed, the underlying terms that would have alerted AHS of a potential antitrust claim.

282. Moreover, MultiPlan publicly disseminates misleading and false information to cover up the fact that it is a commercial health insurance company, thereby hiding the fact that it was colluding with its competitors (other health insurance companies) to suppress payments to providers.

283. The landing page of MultiPlan's website currently states prominently at the top of the page: "**We are not an insurance company**" (original emphasis). MultiPlan's website also

states: "<u>MultiPlan is not a health insurance company</u> and does not sell insurance directly or indirectly through agents or brokers" (original emphasis).

284.   In the "About MultiPlan" section of its press releases, MultiPlan also (mis)characterizes itself as merely a "partner" to health insurance companies and describes those companies only as MultiPlan's "clients[]." MultiPlan does not mention its own role as a health insurance company.

285.   These statements are highly misleading at best, if not entirely inaccurate. MultiPlan is a health insurance company. MultiPlan has one of the oldest and largest PPO networks in the United States. By MultiPlan's own account in a 2020 presentation, MultiPlan became "the largest independent primary PPO network in [the] US" as early as 2006.

286.   MultiPlan's network works like other health insurance networks. Users pay a fee to access the healthcare providers in MultiPlan's PPO network, and MultiPlan administers and adjudicates claims made for medical services in that network. The only difference is that MultiPlan chooses to negotiate with other health insurance companies to access its network instead of employers or individual subscribers. MultiPlan's claims that it is "not a health insurance company" are simply untrue.

287.   MultiPlan's statements made to AHS and the public that MultiPlan is "not an insurance company" were false and MultiPlan intended for AHS, other healthcare providers, and the public to rely upon them.

288.   AHS exercised reasonable diligence at all times since July 1, 2017, but it had no reason to suspect wrongdoing by MultiPlan until (a) the VHS Liquidating Trust filed a California-law antitrust claim against MultiPlan in San Francisco County Superior Court on September 8, 2021 and (b) a March 7, 2022 article raised questions regarding MultiPlan's antitrust compliance.

*See* The Capitol Forum, *MultiPlan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say* (March 7, 2022), https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could-raise-antitrust-concerns-experts-say/. These two events reasonably put AHS on notice that it may have antitrust claims against MultiPlan. AHS could not have discovered the MultiPlan Cartel at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques described above, including MultiPlan's multiple misleading statements that it is not a health insurance company, to conceal the existence of the cartel.

289.     Reimbursement payments to healthcare providers are not exempt from the antitrust laws, and thus, before these recent events, Plaintiff reasonably considered the market for reimbursement payments from commercial healthcare networks to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of MultiPlan's agreements with other commercial insurance networks.

290.     Nor did recent lawsuits against MultiPlan alert AHS to any federal antitrust claims, as none revealed the true nature of MultiPlan's relationship with other insurance companies. For example, *Plastic Surgery Center, P.A. v. Cigna, et al.*, 3:17-cv-2055(FLW)(DEA) (D.N.J.), made claims related to in-network claims—not out-of-network claims—and did not allege antitrust violations. *Hott v. MultiPlan, Inc.*, 21 Civ. 02421 (LLS) (S.D.N.Y.), and *LD v. United Behavioral Health*, 4:20-cv-02254-YGR (N.D. Cal.), both raised grievances concerning MultiPlan's out-of-network reimbursement rates to healthcare providers, but did not allege that the reason for the low rates was that MultiPlan entered into agreements with its competitors to suppress payments. *Pacific Recovery Solutions v. United Behavioral Health*, 4:20-cv-02249 YGR (N.D. Cal.), alleged antitrust violations related to out-of-network reimbursements, but based on an inability to collect

unpaid balances from patients rather than collusion between competitors to tamp down payments to providers.

### G.    Continuing Violation

291.    MultiPlan's conduct has also resulted in a continuing violation against AHS.

292.    Following its initial combination with its Co-Conspirators, MultiPlan has committed overt acts, each of which constitutes part of the ongoing violation.

293.    Members of the MultiPlan Cartel met frequently to refine their cartel agreement and to ensure that the agreement was effective in suppressing out-of-network reimbursement payments to healthcare providers.  Members of the MultiPlan Cartel met during Client Advisory Board meetings to discuss the effectiveness of MultiPlan's products in cutting out-of-network payments to healthcare providers.  MultiPlan representatives also met weekly or daily with executives at UnitedHealthcare concerning out-of-network reimbursements.

294.    Members of the MultiPlan Cartel took steps to maintain and adjust their anticompetitive agreement by renewing contracts with MultiPlan for out-of-network claim suppression and changing the agreed-upon methodology that MultiPlan would use to suppress out-of-network reimbursement payments.  Indeed, MultiPlan told investors in May 2023 that, in the short period between Q3 2022 and Q1 2023 alone, MultiPlan "renewed multiyear contracts with 3 of our larger customers."  According to MultiPlan, "those 3 contracts accounted for more than 50% of [MultiPlan's] revenue." These new agreements that solidify and perpetuate the MultiPlan Cartel are continuing violations of the antitrust laws.

295.    MultiPlan Cartel members also imposed shared savings agreements on employee benefits plans to ensure that the cartelists would generate profits by cutting out-of-network reimbursement payments.

296. MultiPlan's overt actions and the overt actions of its fellow cartelists were new acts beyond the initial cartel agreement that were necessary to perpetuate the conspiracy. Those overt acts continued from at least July 1, 2017 through the present. By constantly renewing and refining their agreement to suppress out-of-network reimbursement payments, the members of the MultiPlan Cartel inflicted new and accumulating injury on AHS.

## VII. Causes of Action

### FIRST CLAIM FOR RELIEF

### HORIZONTAL AGREEMENTS IN RESTRAINT OF TRADE

### (Section 1 of the Sherman Act, 15 U.S.C. § 1)

297. AHS reincorporates and realleges by reference the preceding paragraphs, as though fully set forth herein.

298. Beginning at least as early as July 1, 2017 and through the present, MultiPlan engaged in a continuing contract, combination, or conspiracy with the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

299. MultiPlan is a horizontal competitor with other commercial health insurance networks in the U.S. Commercial Reimbursement Market.

300. MultiPlan's PPO networks compete against other commercial health insurance networks to induce out-of-network healthcare providers to treat their plans' members by paying competitive reimbursement rates. By entering into the MultiPlan Cartel agreement, MultiPlan and its Co-Conspirators removed this form of rivalry amongst themselves by illegally coordinating the reimbursement rates paid to healthcare providers for out-of-network claims.

301.     Alternatively, MultiPlan is a potential competitor to the members of the MultiPlan Cartel because its PPO network could compete against commercial health insurance networks that market their network directly to subscribers.  As noted above, MultiPlan already recruits, accredits, receives claim information, and calculates reimbursement amounts for claims, it simply has not chosen to market its network to subscribers at this time.

302.     But for the MultiPlan Cartel agreement, MultiPlan's complementary and primary network PPO offerings would have acted as a meaningful competitive check on commercial healthcare plans in the United States by competing against them to recruit, credential, and compensate healthcare providers for their services. The MultiPlan Cartel agreement removed that competitive check, causing healthcare providers to be paid less for their services.

303.     MultiPlan and its horizontal competitors in the MultiPlan Cartel, i.e., its Co-Conspirators, reached agreements to fix the out-of-network reimbursement rates they paid to healthcare providers, including AHS.  AHS has direct evidence of these agreements in the form of (1) the contracts that the Co-Conspirators signed with MultiPlan to use its claims repricing services and (2) communications between MultiPlan and its Co-Conspirators surrounding the contracts.

304.     MultiPlan's contracts with the Co-Conspirators require it to reprice claims received by the Co-Conspirators using a methodology common to each member of the MultiPlan Cartel and in reference to pricing levels mutually adopted by its members.  MultiPlan itself uses the same methodologies and pricing levels when repricing claims received through its own PPO networks.

305.     MultiPlan also explicitly recommended prices to its Co-Conspirators that were consistent with and made in reference to the prices of their competitive rivals.  MultiPlan's Co-Conspirators agreed to accept those price recommendations in full knowledge that other members of the MultiPlan Cartel had adopted similar prices.

306. Once MultiPlan and its Co-Conspirators agreed on the methodologies and pricing levels to adopt, MultiPlan began transmitting offers of payment to healthcare providers like AHS on behalf of its Co-Conspirators. MultiPlan also transmitted similarly suppressed offers of payment to healthcare providers who submitted claims to its own PPO networks.

307. In this manner, the MultiPlan Cartel has fixed prices among competitors in the U.S. Commercial Reimbursement Market.

308. Circumstantial evidence also supports the formation of a horizontal agreement to fix prices in the U.S. Commercial Reimbursement Market. This evidence includes parallel conduct among members of the MultiPlan Cartel and "plus factors" which indicate that this conduct was the result of an anticompetitive agreement, including: high market concentration; barriers to market entry; ample motive; opportunities to conspire; previous collusion; and actions against self-interest.

309. The MultiPlan Cartel had a conscious commitment to this common scheme.

310. Healthcare providers, including AHS, were directly and proximately harmed by the horizontal price-fixing of the MultiPlan Cartel. AHS submitted claims for out-of-network healthcare services to members of the MultiPlan Cartel, and MultiPlan and its Co-Conspirators conspired to systematically underpay those claims. These conspiratorial underpayments caused a direct, foreseeable, concrete, and redressable injury to AHS.

311. The injuries suffered by AHS as a result of the MultiPlan Cartel are of a type that the antitrust laws are intended to prevent. Economic losses caused by an agreement among competitors to restrain trade are a classic example of injuries that the antitrust laws are intended to prevent.

312.     AHS's injuries flow from MultiPlan's illegal agreements with the members of the MultiPlan Cartel.    Were it not for those agreements, AHS would have received higher reimbursement payments for out-of-network medical services.

313.     AHS suffered compensable damages as a result of the MultiPlan Cartel.  The exact calculation and amount of those damages will be disclosed in AHS's expert reports and expert testimony at trial.

314.     AHS continues to be harmed by the MultiPlan Cartel's ongoing horizontal price-fixing conspiracy.

315.     AHS exercised reasonable diligence in attempting to ascertain the existence of the MultiPlan Cartel's illegal horizontal price-fixing.

316.     The MultiPlan Cartel fraudulently concealed its horizontal price-fixing from AHS and the public such that the illegal nature of the scheme only became ascertainable after certain lawsuits and regulatory filings made relevant information accessible to the public.

317.     The MultiPlan Cartel's horizontal price-fixing is a *per se* violation of Section 1 of the Sherman Act.

318.     In the alternative, the MultiPlan Cartel's horizontal price-fixing violates the rule of reason under either a quick look or more fulsome analysis because MultiPlan and its competitors entered into agreements that restrained trade in a properly defined relevant market and there is no pro-competitive justification for the MultiPlan Cartel.

## SECOND CLAIM FOR RELIEF

## HUB-AND-SPOKE AGREEMENT IN RESTRAINT OF TRADE

### (Section 1 of the Sherman Act, 15 U.S.C. § 1)

### (Plead in the Alternative to Claims 1 and 3)

319.     AHS reincorporates and realleges by reference the preceding paragraphs, as though fully set forth herein.

320.     In the alternative to AHS's first cause of action, from at least as early as July 1, 2017 through the present, MultiPlan entered into an illegal "hub-and-spoke" agreement with the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

321.     MultiPlan is the "hub" of the "hub-and-spoke" conspiracy.  It initiated the conspiracy, induced the Co-Conspirators to join, facilitates the price-fixing undertaken by the conspiracy, and profits from that facilitation.

322.     MultiPlan's agreements with its health insurance Co-Conspirators to participate in the MultiPlan Cartel constitute the various "spokes" of the conspiracy.

323.     There is direct evidence of these agreements, i.e., "spokes," including (1) the contracts that the Co-Conspirators signed with MultiPlan to use its claims repricing services, and (2) communications between MultiPlan and its Co-Conspirators surrounding those contracts.

324.     As stated above, MultiPlan's contracts with the Co-Conspirators require it to reprice claims received by the Co-Conspirators using a methodology common to each member of the MultiPlan Cartel and in reference to pricing levels mutually adopted by its members.  MultiPlan itself uses the same methodologies and pricing levels when repricing claims it receives through its own PPO networks.

325.     MultiPlan also explicitly recommended prices to its Co-Conspirators that were consistent with and made in reference to the prices of competitive rivals.  MultiPlan's Co-Conspirators agreed to accept those price recommendations in full knowledge that other members of the MultiPlan Cartel had adopted similar prices.

326.     The "rim" of the "hub-and-spoke" conspiracy is formed by the agreements between the health insurance Co-Conspirators to adopt MultiPlan as the industry-wide repricer of out-of-network claims. Voluminous circumstantial evidence supports the existence of these "rim" agreements, including parallel conduct among members of the MultiPlan Cartel and "plus factors" indicating that this conduct was the result of an anticompetitive agreement (i.e., high market concentration, barriers to market entry, ample motive, opportunities to conspire, previous collusion, and actions against self-interest).

327.     The injuries suffered by AHS as a result of the MultiPlan Cartel are of a type that the antitrust laws are intended to prevent.  Economic losses caused by an agreement among competitors to restrain trade are a classic example of injuries that the antitrust laws are intended to prevent.

328.     AHS suffered compensable damages as a result of the hub-and-spoke conspiracy formed by the MultiPlan Cartel.  The exact calculation and amount of those damages will be disclosed in AHS's expert reports and expert testimony at trial.

329.     AHS's injuries flow from the MultiPlan Cartel's illegal "hub-and-spoke" conspiracy.  Were it not for the conspiracy, AHS would have received higher reimbursement payments for out-of-network medical services.

330.     AHS continues to be harmed by the MultiPlan Cartel's ongoing "hub-and-spoke" conspiracy.

331.    AHS exercised reasonable diligence in attempting to ascertain the existence of the MultiPlan Cartel's illegal "hub-and-spoke" conspiracy.

332.    The MultiPlan Cartel fraudulently concealed its "hub-and-spoke" conspiracy from AHS and the public such that the illegal nature of the scheme only became ascertainable after certain lawsuits and regulatory filings made relevant information accessible to the public.

333.    The MultiPlan Cartel's "hub-and-spoke" conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act.

334.    In the alternative, the MultiPlan Cartel's "hub-and-spoke" conspiracy violates the rule of reason under either a quick look or more fulsome analysis because MultiPlan and its competitors entered into agreements that restrained trade in a properly defined relevant market and there is no pro-competitive justification for the MultiPlan Cartel.

### THIRD CLAIM FOR RELIEF

### AGREEMENTS TO UNREASONABLY RESTRAIN TRADE

### (Section 1 of the Sherman Act, 15 U.S.C. § 1)

### (Plead in the Alternative to Claims 1 and 2)

335.    AHS reincorporates and realleges by reference the preceding paragraphs, as though fully set forth herein.

336.    In the alternative to AHS's first and second causes of action, from at least as early as July 1, 2017 through the present, MultiPlan engaged in a continuing agreement with each of the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

337.    The MultiPlan Cartel has dominant collective market power in the U.S. Commercial Reimbursement Market.  It also has complete power in each relevant submarket,

where healthcare providers have no choice but to submit their claims for reimbursement to the specific health insurance company operating the health insurance plan in which the patient is enrolled.

338.    MultiPlan and each of the other commercial health insurance networks entered into anticompetitive agreements that harmed competition in the U.S. Commercial Reimbursement Market and its submarkets by intentionally suppressing the prices paid to out-of-network healthcare providers, including AHS.

339.    The MultiPlan Cartel's price-fixing agreements are each an unreasonable restraint on trade in violation of Section 1 of the Sherman Act.  MultiPlan and its Co-Conspirators entered into agreements that used their combined market power to restrain trade in the relevant market and relevant submarkets without any pro-competitive justification.  Even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

340.    AHS's injuries flow from MultiPlan's illegal agreements with each member of the MultiPlan Cartel.  Were it not for those agreements, AHS would have received higher reimbursement payments for out-of-network medical services.

341.    AHS suffered compensable damages as a result of the MultiPlan Cartel.  The exact calculation and amount of those damages will be disclosed in AHS's expert reports and expert testimony at trial.  AHS continues to be harmed by the MultiPlan Cartel's ongoing vertical price-fixing conspiracy.

## VIII.   Prayer for Relief

WHEREFORE, AHS demands that judgment be entered in its favor and against MultiPlan, including for the treble damages, injunctive relief, and declaratory judgement outlined below. Specifically, AHS seeks an order and judgment from this Court that:

a)      MultiPlan pay damages to AHS for underpayments made to AHS, lost profits and revenues of AHS, and other economic harm to AHS as a result of the MultiPlan Cartel in an amount to be determined at trial and that may be trebled by operation of law;

b)      MultiPlan pay pre-judgment and post-judgment interest on such monetary relief;

c)      MultiPlan pay AHS's costs of bringing this lawsuit, including AHS's reasonable attorneys' fees;

d)      MultiPlan is permanently enjoined from continuing to operate the MultiPlan Cartel;

e)      A declaratory judgment that MultiPlan has violated Section 1 of the Sherman Act; and

f)      All other relief to which AHS may be entitled at law or equity.

Dated: August 9, 2023

VINSON & ELKINS LLP

*/s/ Christopher E. Duffy*

Christopher E. Duffy
Mackenzie Newman
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0000
Fax: (212) 237-0100

Stephen M. Medlock*
Tyler Somes*
Michael McCambridge*
Molly McDonald*
Rami Abdallah E. Rashmawi*
2200 Pennsylvania Ave., N.W.
Suite 500 W
Washington, D.C. 20037
Tel: (202) 639-6500
Fax: (202) 639-6604

Michael Scarborough*
Dylan Ballard*
Madison Lo*
555 Mission Street
Suite 2000
San Francisco, CA 94105
Tel: (415) 979-6900
Fax: (415) 651-8786

Travis Korman*
Texas Tower
845 Texas Avenue
Suite 4700
Houston, TX 77002
Tel: (713) 758-2222
Fax: (713) 758-2346

*Attorneys for Plaintiff Adventist Health System
Sunbelt Healthcare Corporation*

*Pro Hac Vice Motion Forthcoming

## DEMAND FOR JURY TRIAL

AHS respectfully requests a jury trial on all causes of action in this matter.

Dated: August 9, 2023

VINSON & ELKINS LLP

*/s/ Christopher E. Duffy*

Christopher E. Duffy
Mackenzie Newman
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0000
Fax: (212) 237-0100

Stephen M. Medlock*
Tyler Somes*
Michael McCambridge*
Molly McDonald*
Rami Abdallah E. Rashmawi*
2200 Pennsylvania Ave., N.W.
Suite 500 W
Washington, D.C.  20037
Tel: (202) 639-6500
Fax: (202) 639-6604

Michael Scarborough*
Dylan Ballard*
Madison Lo*
555 Mission Street
Suite 2000
San Francisco, CA 94105
Tel: (415) 979-6900
Fax: (415) 651-8786

Travis Korman*
Texas Tower
845 Texas Avenue
Suite 4700
Houston, TX 77002
Tel: (713) 758-2222
Fax: (713) 758-2346

*Attorneys for Plaintiff Adventist Health System Sunbelt Healthcare Corporation*

* Pro Hac Vice Motion Forthcoming